**VERMONT MARBLE COMPANY,**
**Plaintiff,**

v.

**BALTIMORE CONTRACTORS,**
**INC., Defendant.**

**Civ. A. No. 79–3079.**

United States District Court,
District of Columbia.

Aug. 20, 1981.

John B. Denniston, John J. McKetta, III, David Medine, Covington & Burling, Washington, D.C., for Vermont Marble.

Herman M. Braude, Andrew W. Stephenson, Judith F. Herman, Braude, Margulie's, Sacks & Rephan, Washington, D.C., for Baltimore Contractors.

MEMORANDUM AND ORDER

CORCORAN, Senior District Judge.

This matter is before the Court on cross motions for summary judgment. Additionally the plaintiff, Vermont Marble Company, has moved for partial summary judgment on several underlying issues.

The action arises out of the construction of an extension to the Everett McKinley Dirksen Senate Office Building on Capitol Hill. The defendant, Baltimore Contractors Inc. (BCI), was the prime contractor with the Architect of the Capitol (AOC or Architect) to perform "Phase IV" in the construction.

The plaintiff, Vermont Marble Company (VMC) was a subcontractor to BCI. Its undertaking was to do the stonework facing on the building. Roughly 20 months after signing the subcontract, VMC abandoned the project asserting a right to rescind by reason of undue delays in the preparation of the site for the performance of its stonework.

Shortly before formally rescinding, VMC filed this action seeking a declaration of its rights under the subcontract and asking monetary relief in the nature of *quantum meruit* for the work it had performed thereunder.

### A. Factual Background

1. *The Prime Contract Between the Architect and BCI*

In the summer of 1977 the Architect invited bids for "Phase IV" of the extension of the Dirksen Building. Phase IV involved the construction of the superstructure of the building.[1] BCI was awarded the contract and on October 28, 1977 was given "notice to proceed."

Under its prime contract with the Architect, BCI agreed to certain "milestone" dates for completion of specified major steps of construction. The original milestones, measured from the October 28, 1977 notice to proceed, were as follows:

---

1. Under earlier "phases," foundation work and stone quarrying and delivery had been completed.

1. Commencement of structural steel installation: 185 days (April 30, 1978).
2. All concrete and fireproofing through first six floors: 440 days (January 10, 1979).
3. All concrete and . . . through remaining floors and roof: 550 days (April 30, 1979).
4. Stone installation and masonry work through first six floors: 745 days (November 11, 1979).
5. Completion of all work: 900 days (April 14, 1980).

## 2. *The Subcontract Between BCI and VMC*

In August 1977, VMC sent a proposal to BCI for a subcontract to perform the stonework. BCI used the VMC bid in its bid for the prime contract. In December, 1977, BCI presented VMC with a counter proposal which consisted of BCI's standard form subcontract with 11 pages of attached "riders." Among the key elements of the Baltimore Contractors' proposal were the following:

1. Article IV, stating in part, that "Subcontractor shall . . . prosecute the work . . . in prompt and diligent manner; and . . . where necessary to expedite the performance thereof, the authorized representative of subcontractor shall take orders directly from the Superintendent of Contractor. Subcontractor shall do the several parts of the work at such times and in such order as Contractor may direct and shall proceed with and wholly finish the work in such time as not to delay Contractor or other subcontractors, and to insure completion of the Prime Contract within the time fixed therein; . . . it being understood that time is of the essence of this Agreement."

2. Article XIV, included a "no-damage-for-delay" clause, providing, *inter alia*: "Contractor shall have the right at any time to delay or suspend the commencement or execution of the whole or any part of the work without compensation or obligation to subcontractor other than to extend the time for completing the work for a period equal to that of such delay or suspension."

3. A rider directing subcontractor's attention to the milestone and liquidated damages provisions of the prime contract.

4. A rider representing that Baltimore Contractors would "prepare an anticipated Construction Schedule" outlining the work to be accomplished by each subcontractor to insure completion of the project as outlined in the schedule.

In January and February, 1978, representatives of the contracting companies met and exchanged correspondence in an effort to reach an acceptable rewrite of those provisions of the BCI proposal which VMC found unacceptable.

Eventually, subcontract language acceptable to both sides was reached. Article IV remained essentially in the form BCI proposed. The most significant change was that Article XIV's "no-damage-for-delay" clause was eliminated and replaced by carefully negotiated rider paragraph 32, which read as follows:

■ Should Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work because of conditions attributable to Owner and which by the terms of the Prime Contract may be grounds for an extension of time or money damages, Subcontractor shall promptly make claim therefore in writing, and Contractor shall present said claim to the Owner. Contractor shall pay to Subcontractor whatever money damages or extensions of time allowed by Owner to Contractor * under the Prime Contract for said delay claim. [2] Contractor for just cause shall have the right at any time to delay or suspend the commencement or execution of the whole or any part of the Work without compensation or obligation to Subcontractor other than to extend the time for completing the Work for a period equal to that of such delay or suspension.

---

* For Subcontractor

■ Nothing herein shall in any way preclude the right of Subcontractor to make claims against the Contractor for any un-

reasonable length of delay of Subcontractor's work within Contractor's control or within the control of any other Subcontractor to Contractor.

The subcontract was executed on February 15, 1978.* "Critical Path Method" schedules were prepared which appeared to accommodate all trades sufficiently to permit completion of the project within the limits of prime contract "Milestone 5." But performance lagged. The delays prevented VMC from commencing stone installation at least until sometime in the fall of 1979— too late to meet the requirements of Milestone 5. Moreover, it is undisputed that the major portion of the work, known as the "extension building," became ready for VMC's stonework only in the spring (April or May) of 1980.[2]

### 3. Status of the Job in November, 1979; Rescission

The parties agree that preparatory work on the major portion of the project, the extension building, was not sufficiently completed to allow commencement of stonework in the agreed-upon sequence until early-to mid-spring, 1980. BCI contends, however, that the lesser portion, the "central wing"[3] was ready for stonework in November, 1979. VMC disputes this contention, but does not specifically assert some other ready date for the central wing. In any

event, throughout 1979, VMC had maintained a job presence and willingness to proceed with stone installation when the site was ready.

On October 26, 1979, VMC's counsel wrote to BCI stating VMC's belief that there had been unreasonable delays in making the site ready for commencement of stone work. In that letter, VMC stated its intention to perform stone work if the delay were not substantially the fault of BCI (or its other subcontractors). It further stated VMC's intention to rescind the contract if BCI (or its other subcontractors) were responsible for the delay. It demanded documentation from BCI as to the causes of and responsibility for the delays. Finally, the letter told of VMC's plan to mitigate its damages by recalling those VMC employees from the construction site whose services were not then required.

BCI does not contend that it provided the requested documentation. It does point out that the AOC had strongly urged VMC not to rescind and advised that only the AOC could render decisions regarding extensions of time.

On November 9, 1979, VMC filed this lawsuit to determine its rights under the subcontract and to recover damages.

On November 16, 1979, VMC was still of the view that even the central wing area

---

**2.** There were numerous factors contributing to the delay. The parties can agree on some of the reasons for delay; they cannot agree on the assignment of fault or on the impact upon VMC's performance.

One major source of delay was the mislocation of "anchor bolts" to which would be attached steel plates on which the superstructure would rest. George Hyman Construction Co., prime contractor under Phase II (foundation work), was responsible for the mislocations.

Another source of delay was the improper coordination of steel erection and the installation of metal floor decking. Stone installation could not commence until structural steel erection, metal decking and concrete pouring had progressed to a minimum level of completeness. There was yet another suggested source of delay. The AOC ordered changes in the work to preserve the Belmont House, a historic structure, located at the Southeast corner of the job site.

As noted, the parties are in dispute as to the causes and effects of the delays and to where fault should be ascribed.

In view of our disposition of the case, we need not resolve these disputes.

**3.** BCI asserts that the so-called "central wing" a relatively small and largely separate portion of the Dirksen project, was ready to accept stone installation by mid-November, 1979. VMC disputes this assertion, and moreover contends that the assertion is immaterial "since the entire scope of the stone installation was paced by the readiness of the extension building and since the central wing stonework was to commence only shortly earlier than the extension building stonework . . . ." VMC argues that the only effect of commencing stonework on the central wing in November, 1979 "would have been to convert a 15-month job into a 20-month job." VMC *Supplemental Memorandum Concerning the Cross-Motions for Summary Judgment* at 14–15.

remained unready for stonework; accordingly it then withdrew its forces from the site. VMC claims that this action was simply the implementation of its stated intention to mitigate by not maintaining an unutilized job presence. VMC asserts that in mid-November it still had not decided to rescind.

VMC had decided by December 12, 1979 and on that date stated by letter that it would henceforth treat the subcontract as rescinded.[4]

BCI's version of the events of the Fall of 1979 emphasizes VMC's allegedly unreasonable refusal to consider methods and sequencing of operations which deviated from those earlier anticipated and agreed upon. BCI suggests that VMC's decision to rescind was made well before December, 1979 and that it simply waited until the time which appeared to be to its greatest advantage. BCI suggests that, VMC coldly calculated the rescission and firmly resisted commencement of stonework by using as excuses the unprepared status of the job site and BCI's repeated requests for work out of agreed sequence. Only when VMC ran out of excuses, charges BCI, did it finally decide to rescind.[5]

### B. The Legal Issues Presented by the Cross Motions for Summary Judgment

Plaintiff's motion for summary judgment "seeks a determination that Vermont Marble Company was justified in treating the subcontract as rescinded regardless of the relative fault [for delays] of the Architect, BCI or BCI's other subcontractors." VMC Mem. at 89. VMC's principal argument is that the delays irrespective of where fault lay, amounted to a material breach of the subcontract and thereby gave VMC a common law election: "to terminate the contract or perform and sue for breach damages." VMC Mem. at 90.

BCI presents a number of arguments in opposition to plaintiff's motion. BCI charges first that the delays alone did not amount to a material breach. BCI further asserts that rider ¶ 32 precluded rescission as an option to VMC. Next BCI argues that VMC was bound by the "disputes" clause of the prime contract.

As an alternative argument, BCI contends that VMC, if it ever had a right to rescind, waived that right by failing to exercise it promptly when it arose.

BCI's motion for summary judgment is less complex. It asserts, simply, that, even if all the facts alleged in the complaint are true, VMC had no right to rescind the subcontract or if it had the right, the right was waived. Therefore, argues BCI's motion, in rescinding, VMC itself breached the subcontract. VMC of course opposes BCI's motion on the ground that it rightfully and timely rescinded.

### C. The Court's Conclusions

The Court concludes that, as a matter of law, VMC wrongfully rescinded. Summary Judgment should, therefore, be entered for defendant, BCI.

4. It is apparent that VMC considered rescission was early as September, 1979 but on the advice of counsel chose to "bide our time until April [1980, when the entire project was originally to have been completed]." See BCI's *Appendix to Memorandum in Opposition to Plaintiff's Motion For Summary Judgment as to Liability or, Alternatively, for Partial Summary Judgment* at 25.

5. BCI's position is succinctly stated in the following paragraph from its memorandum in opposition to VMC's instant motion for summary judgment.

> The project had been inarguably ready for VMC to begin its work in the Central Wing. Now VMC had finally obtained access to the Central Wing. Now VMC had to make a choice. On the one hand, its attorneys were advising it that its claim would be much better if it could wait until April 1980, before beginning work. On the other hand, it knew it could make no further excuses. It knew the project was ready for it to begin. The AOC was stating it was ready for it to begin. When Dan Lepore & Sons visited the site for an inspection, Dan Lepore & Sons knew that the site was ready for the stonework to begin. ... Instead of abiding by its subcontract, VMC abandoned the job. *Memorandum in Opposition to Plaintiff's Motion for Summary Judgment as to Liability or, Alternatively, for Partial Summary Judgment* at 73–74.

We begin our discussion of how we reach this conclusion by concurring wholeheartedly in Judge Kern's recent observation that

> except in the middle of a battlefield, nowhere must men coordinate the movement of other men and all materials in the midst of such chaos and with such limited certainty of present facts and future occurrences as in a huge construction project.... Even the most painstaking planning frequently turns out to be mere conjecture and accommodation to changes must necessarily be of the rough, quick and *ad hoc* sort, analogous to ever-changing commands on the battlefield.

*C. J. Coakley Co., Inc. v. Blake Construction Co., Inc.*, 431 A.2d 569 (D.C.App.1981).

We believe the subcontract herein was negotiated with special attention to the great uncertainties which face major participants in a monumental undertaking such as was the Dirksen project. Rider paragraph 32 of the subcontract, painstakingly negotiated, reflects the parties attempt to provide for their respective rights and obligations under various circumstances which might arise during the course of performance. The details of such circumstances, like the details of a battle, obviously were quite unforeseeable. It is because of the inability to precisely foresee difficulties that parties to construction subcontracts such as this one attempt to use general language which will provide guidance in as broad a range of situations as possible. In our view, rider paragraph ·32 of the instant subcontract represents just such an attempt.

#### 1. *"Time-Is-of-the-Essence"*

■ Before returning to rider paragraph 32, let us examine VMC's central argument. VMC asserts that rescission was proper because the delays in the preparation of the Dirksen job site for the commencement of stonework constituted a material breach of the subcontract. The cases are legion which stand for the proposition that a material breach of contract gives rise to election by the non-breaching party: the latter may either terminate the contract or perform and later sue for breach damages. *See, e. g., John W. Johnson, Inc. v. Basic Construction Co.*, 292 F.Supp. 300 (D.D.C. 1968), *aff'd.* 429 F.2d 764 (D.C.Cir.1970).

The first and principal issue confronting the Court, then, is whether, as VMC claims, BCI had materially breached the subcontract at the time VMC rescinded.

VMC relies foremost upon Article IV of the subcontract wherein appears the language: "[T]ime is of the essence of this Agreement." This language, VMC contends, entitled it to rescind upon the occurrence of any slippage from agreed performance dates.[6] In VMC's view, any delay at all amounts to a material breach of the subcontract.

This argument is too facile. It ignores the cardinal principal of contract interpretation which requires that a contract be read and interpreted as a whole, finding meaning in all parts if possible, while finding meaning in the whole.

Other provisions of the subcontract favor a less drastic interpretation of the time-is-of-the-essence clause. Article IV itself suggests that the clause may be for the benefit of the contractor rather than the subcontractor since the article otherwise exclusively discusses the subcontractor's obligation to perform. It requires VMC to perform when and in such order as BCI directs. The context of the clause suggests that it may be the subcontractor's obligation—rather than its right—to perform at a certain time which is of the essence.

Even if the favored reading of Article IV were that which makes each party's timely performance important, VMC's argument fades in persuasiveness when viewed in conjunction with rider paragraph 32. The very

**6.** To arrive at the date by which performance had to have begun in order to fulfill the requirements of the subcontract, VMC simply notes that the subcontract incorporated the prime contract's fifth milestone of completion by April 14, 1980. From this date, VMC "subtracts" the 15 months which the subcontract provided for stonework and concludes that a commencement date of mid-January 1979 was contractually required.

first provision of this carefully drafted paragraph belies the assertion that any delay gives rise to an immediate right to rescind. Under this clause if VMC is "obstructed or delayed ... in the Work because of conditions attributable to the [AOC]," VMC has but one course of action: "it *shall* promptly make a claim therefore in writing." (emphasis added). The term "shall" admits only of the interpretation that the requirement is mandatory, leaving other avenues, rescission for example, closed. So, under the subcontract, at least where delays are attributable to the Architect, rescission is not an option available to VMC.

In light of these other provisions, we conclude that the phrase "time-is-of-the-essence" as used in this subcontract did not give to VMC a right to rescind on the basis of any delay, however slight and from whatever source, in the readiness of the site for its work.

### 2. *Rider Paragraph 32*

■ Indeed, our evaluation of the subcontract, especially rider paragraph 32, leads us to the conclusion that delay alone could not amount to a material breach. In short, under this subcontract, rescission becomes an available remedy only when the remedies provided in rider paragraph 32 fail of their purpose. In the case at bar, the latter point was never reached.

Rider paragraph 32 has three separate, but related, clauses. As noted above, the first clause mandates that VMC present claims for extensions of time and money damages to the AOC (through BCI) when VMC's performance is delayed by conditions attributable to the AOC. The second clause permits BCI, "for just cause," to delay or suspend VMC's performance at any time without obligation except to grant VMC an extension of time equal to the time lost. The third clause is best read as an amplication of, or at most a corollary to the second

clause. It simply makes plain that should BCI delay VMC's work for an unreasonable length of time, VMC has the right to "make claims [7] against" BCI.

These three clauses were designed to provide and define the rights and obligations of the subcontractor and the contractor in the event of delays. The meaning of these clauses would be grossly warped and their effectiveness diluted if VMC were to have, in addition to the rights therein provided, the alternative but unmentioned right to walk away from the project without obligation. The parallel goals which the clauses seek to achieve are (1) to ultimately provide fair compensation to VMC for the work it is required to do while (2) prosecuting the project with a continuity uninterrupted by disputes over precisely what compensation is fair under the circumstances. In other words, the objective of rider paragraph 32, it seems, was to give the prime contractor the control necessary to move the work along without prejudicing the subcontractor's right to adequate compensation. It is essential that the prime contractor on projects such as Dirksen be permitted to say to its subcontractors, in essence, "Work now, ask questions later." The goal of continuous work would be difficult to achieve if every time it exercised its right to suspend work under the second clause, BCI risked that VMC would interpret the delay as a material breach entitling it to rescind. Even if such an interpretation by VMC were wrong, the delay on the project might well be compounded. In light of rider paragraph 32, we conclude that even "unreasonable" delays are not material breaches of this subcontract. Rather, a material breach might arise only if BCI refused to pay a properly presented claim. Nothing in the record indicates that VMC ever presented a specific claim for additional compensation, or that BCI ever refused to pay such a claim.[8] Accordingly no right to rescind ever arose in VMC.

---

7. The word "claims" used here means, we believe, requests for extensions of time or further compensation. No broader definition seems consistent with the context of rider paragraph 32.

8. A letter dated February 26, 1979 from VMC to BCI generally demands "payment in full of all excess costs incurred to date for the delays thus far suffered." The letter also threatens "not to proceed unless and until a proper and

In light of this conclusion, we need not reach the other issues raised by the motions for summary judgment.

Accordingly, it is this 20th day of August, 1981,

ORDERED, ADJUDGED and DECREED that plaintiff's Motion for Summary Judgment as to Liability or, Alternatively, for Partial Summary Judgment be and the same is hereby DENIED; and it is

FURTHER ORDERED, ADJUDGED and DECREED that defendants Motion for Summary Judgment be and the same is hereby GRANTED.[9]

equitable adjustment in price has been achieved and agreed upon." In the Court's view, this is a claim under neither the first nor third clause of rider paragraph 32. It is devoid of specific figures and supporting documentation. Moreover, it is apparent that VMC failed to follow up its threat since it continued preparatory work required under the subcontract and prime contract. Accordingly, VMC abandoned any claim contained in the February 26, 1979 letter. Even if the letter did amount to a claim and was not abandoned, it is clear that BCI did not refuse the claim; rather BCI made an effort to incorporate VMC's loss in the claim it (BCI) had pending before the AOC. Finally, the matters raised in February, 1979 cannot be said to go to the heart of VMC's subcontract rights; hence any breach by BCI in connection therewith cannot be said to be material. The letter appears in VMC's *Appendix to Memorandum in Support of Plaintiff's Motion for Summary Judgment as to Liability or, Alternatively, for Partial Summary Judgment* at 201–02. The reply from BCI appears at 221–22.

9. The issue of damages owing defendant by plaintiff remains for trial.