**GRANITE COMPUTER LEASING CORP., Plaintiff,**

v.

**The TRAVELERS INDEMNITY COMPANY, Defendant.**

**No. 81 Civ. 7705 (CBM).**

United States District Court, S.D. New York.

Nov. 28, 1988.

Shea & Gould, Lauren J. Wachtler, Barbara Slott, New York City, for plaintiff.

Max E. Greenberg, Cantor, Trager & Toplitz, James H. Reidy, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

## I. BACKGROUND

The dispute concerns a contract involving Community Science Technology, Inc. (CST), National Modular Systems Corp. (NMS), and NMS' surety, The Travelers Indemnity Company (Travelers). The facts concerning this action are more fully set forth in this court's prior Amended Opinion of March 23, 1987, and will only be summarized here.

In March of 1973, CST was awarded a general contract by the United States Government for the manufacture and installation of prefabricated modular housing units at several Air Force bases. In April of 1973, CST entered into a subcontract with NMS in which NMS was to manufacture and deliver the necessary modular units for bases on the East Coast. As required by the terms of the subcontract, NMS obtained a performance bond with Travelers wherein NMS was named as principal, CST as obligee, and Travelers as surety.

In the spring of 1974, NMS encountered substantial financial difficulties. On April 5, 1974, NMS demanded a substantial increase in the contract price from CST. On April 26, 1974, NMS submitted to the Government a request for Extraordinary Relief in the amount of $750,000. On June 21, 1974, NMS closed its plant. Travelers was requested to intervene to provide financial assistance to its principal. Because of Travelers' refusal to extend the requested aid, CST, facing a possible termination by the Government, decided to advance the funds necessary for NMS to resume its plant operations. On July 8, 1974, CST and NMS entered into a financing agreement, with the consent of Travelers, and provided that no provision of the financing agreement was to operate as a waiver or relinquishment of any of the parties' rights or remedies.

In 1976, after the military housing project was completed, CST instituted suit against Travelers to recoup funds it had provided NMS to enable NMS to reopen its plant. This lawsuit was stayed pending administrative claims which CST had previously instituted against the Government on behalf of itself and its subcontractors. The claims against the Government settled in 1980. The Government agreed to increase the contract prices by approximately

$2,800,000. The settlement proceeds were allocated to the subcontractors, including NMS. CST also applied a portion of the settlement proceeds to the amount it expended, pursuant to the financing agreement, that was still outstanding and owed by NMS. This allocation did not cover in full the funds CST previously provided.

Granite Computer Leasing Corp., a successor in interest to CST, now seeks to recover from Travelers the amount still remaining to CST that was not covered by the allocation from the Government's award. According to Granite, NMS' plant closure in June 1974 constituted a breach of its contract with CST, thereby triggering Travelers' suretyship obligations to provide financing for its principal, NMS, or to ensure its principal's performance. Travelers, on the other hand, claims that the plant closing by NMS was not a breach by NMS under the NMS/CST subcontract, and that even if it was a breach, it was justified due to prior breaches caused by either CST or the Government.

After hearing the trial testimony, examining the parties' exhibits, and studying all the evidence, the court now grants plaintiff Granite's motion for a directed verdict.

## II. DISCUSSION

In its prior Amended Opinion of March 23, 1987, the court ruled that 1) "the bond between NMS and Travelers required the latter to ensure actual performance of the subcontract should NMS default, and in no way required a failure of indemnification on NMS's part for the ripening of the obligation; 2) that the 'disputes resolution' clause of the main contract was applicable to NMS at the time of its plant closing in June 1974." (Amended Opinion at 5).

### A. Traveler's Obligation

It is settled law, as Travelers maintains, that a surety's "obligations are no more than co-extensive with that of its principal." (Defendant's Memoranda in Opposition to Plaintiff's Motions for Multiple Relief, 8/15/88, Memorandum In Opposition to Motion #1, at 3). Accordingly, "'there can be no obligation on the part of the surety unless there has been a default by the contractor on his contract.'" *Pacific Employers Ins. Co. v. City of Berkeley*, 158 Cal.App.3d 145, 204 Cal.Rptr. 387, 390 (1st Dist.1984) (quoting 13 *Couch on Insurance* § 47:20, at 240–242 (2d ed. 1982)). *See also* 74 *Am Jur 2d*, Suretyship, § 25 (1974) ("Since the obligation of a surety is accessory to that of a principal debtor, it follows that the liability of the surety is ordinarily measured by the liability of the principal, and cannot exceed it.").

Travelers is therefore not liable on its bond unless its principal NMS is liable for breach of contract with CST. Travelers contends that its principal NMS "was never in default of or in breach of the Supply Contract," (Pre-trial Order, 10/14/87, at 14), that CST was the one in default because of late payments, failures to pay, delays, changes in design, "failures to obtain timely approval of prototypes," *id.*, failure to pay "NMS' proportionate share of progress payments received by CST from the Government for the 'design' portion of the project," *id.* at 18, etc. The alleged prior breaches by CST gave NMS the right to rescind its contract, in spite of the "proceed diligently" clause,[1] and according to Travelers, since its principal was not in default, its suretyship obligations were not triggered.

### B. Travelers' Claim of Late Payments or Non–Payments

#### a. Design Payments

Travelers asserts, among other things, nonpayment and/or late payments as a de-

---

1. Paragraph 6 of the "Disputes" clause of the contract between CST and the Government provides, in pertinent part, that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer...." "Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

As stated, the court, for reasons delineated in the prior Amended Opinion, has previously ruled that the "proceed diligently" mandate of the prime contract between CST and the Government was applicable to NMS at the time of NMS' plant closing in June 1974.

fense for NMS' plant closing. Specifically, Travelers claims that "CST was tardy in its payment of contract monies (progress payments) to NMS." (Defendant's Pre–Trial Memorandum at 11). "That failure to pay, by itself, excused further performance by NMS." *Id.* at 18.

Granite contends, however, that even if NMS was entitled to payment for design work, it did not comply with the payment provisions of the contract requiring requisition before payment (Memorandum Relating to Granite's Position on 'Non–Payment' of the $100,000 to NMS by CST for Design Work, at 2–6).

This court has previously ruled that Travelers is precluded from offering evidence of nonpayment of design work as justification for NMS' plant closure on June 21, 1974, because NMS failed to requisition for payments in contravention of terms provided in the contract. For reasons more fully stated below, the court adheres to its prior determination that NMS was contractually bound to requisition for payment, including design payment, before CST was obligated to make such payments to NMS.

Article II of the subcontract between CST and NMS provides for a total, fixed contract price of $3,347,180, to be paid to NMS for "all services and materials to be rendered and furnished by NMS." Travelers stated in its November 7, 1988 letter to the court, that it concedes that design payments were included in the inclusive contract price, but argues that the issue of contention is the *"timing* of payment of the contract price to NMS by CST...." (emphasis in original). In other words, Travelers argues that the Government's payment to CST for the design portion of the project should have been immediately paid to NMS within ten days of receipt, and should not have been " 'paid out' over the term of the contract as part of the progress payments made for delivery of each module." (Travelers' November 7, 1988 Letter to the Court).

■ This court does not agree that design payments were somehow immune from contractual requirements for requisi-

tion prior to payment. Article II, subsections 1(a) and 1(b) of the subcontract referring to payment for materials so provide. (requiring invoices to be furnished with payment request). General Provision 7 and Special Provision 9 of the Prime Contract also require similar documentation. General Provision 7(b) requires the Government to make progress payments on "estimates approved by the Contracting Officer" and "[i]f requested by the Contracting Officer, the Contractor shall furnish a breakdown of the total contract price showing the amount included therein for each principal category of work, in such detail as requested, to provide a basis for determining progress payments." Special Provision 9(a) similarly requires invoices to be furnished "with any such payment request."

Thus, according to General Provision 7 and Special Provision 9 of the Prime Contract, upon request of the government, CST would have to provide some sort of documentation, such as invoices, for work CST and its subcontractors did. In order to provide "a breakdown of the total contract price," CST in turn would necessarily need some sort of documentation from its subcontractor NMS. If NMS was entitled to design payments, it did not requisition for design work in violation of payment provisions in the contract and the subcontract. Travelers cannot now complain that design work which its principal may have performed was only paid out as "part of the progress payments" (Travelers' Letter, *supra*) rather than automatically doled out to NMS within ten days upon receipt of payment by CST.

In spite of abundant contractual provisions requiring invoices and requisitions for payment, Travelers nonetheless argues that those provisions delineating requisitioning procedures apply only to progress payments for materials. (Travelers' Brief on 'Non–Payment' Defense, at 2). According to Travelers, other progress payments, presumably for design work, were exempt from requisition requirements and became automatically due once CST received payment from the government. Travelers

cites as support for this proposition subparagraph (g) of Article II of the subcontract:

> Other progress payments will be made in accordance with Provision 7 of the General Provisions of the Contractor and within ten (10) days subsequent to the receipt of payment by the Contractor.

General Provision 7, as discussed above, requires the contractor to furnish a breakdown of the contract price, if requested by the Government. This provision surely can be of no help to Travelers. Travelers, instead, points to a scant one-sentence amendment to Provision 7, which merely states that "[s]tatutory limitation precludes design costs from exceeding six (6) percent of the construction cost." Because this amendment 7(f) makes no mention of backup requirement, Travelers assumes that therefore no backup requirement exists for design work, in spite of the fact that multiple provisions exist in both the prime contract and subcontract requiring precisely such backup. Without an explicit provision unequivocally exempting documentation for design work, this court refuses to assume that in the midst of all the above-mentioned contractual provisions requiring requisitioning and backups, amendment 7(f)'s one-sentence description that design costs are not to exceed six percent of construction cost somehow eliminates all the other backup requirements.

As part of the same argument, Travelers points further to the portion in subparagraph (g) of Article II of the subcontract, stating, as quoted above, that "[o]ther progress payments will be made ... within ten (10) days subsequent to the receipt of payment by the Contractor." In several pre-trial conferences, counsel for Travelers argues that "[b]y the contract term which I have just read, that payment was due, the proportional part of that payment was due to National within 10 days after the contractor's receipt.... No requirement of a requisition is required by the provision which I just read.... That payment was automatically due." (10/27/88 Transcript, at 16). This court remains unpersuaded. The issue here remains the requisite procedure *prior* to payment, backup requests *before* payment can be made, not what

should happen subsequent to CST' receipt of government money.

■ The court thus holds that regardless of whether or not NMS was contractually entitled to design payments from CST, its failure to requisition for payments in essence nullified any alleged right it may have had to be paid for design work. Travelers is therefore not entitled to claim what its principal is not entitled to claim—nonpayment of design work as justification for NMS' plant closing on June 21, 1974.

#### b. *Late Progress Payments*

Travelers repeatedly claims that NMS' plant closure resulted from prior breaches caused by CST, "principally delays and failures to pay." (Defendant's Pre–Trial Memorandum, at 9; *see also id.* at 10 (Travelers claiming CST's "failure to timely pay sums due to NMS."); Defendant's Contentions, 5/19/87, at 5–6). Yet evidence presented at trial reveals that CST made all payments requisitioned from NMS. From plaintiff's exhibit number 4, a chart compiling information gathered from books and records of CST and NMS, Mr. Bernstein testified about the requisitions received by CST, the dates of receipt, the requisitions CST passed on to the government, the payments received from the government, the dates of such receipt from the government, the payments CST made to NMS, and the dates of such payments to NMS. (11/15/88 Trial Transcript, at 89–94). According to Mr. Bernstein, the total amount of NMS' requisitions as of the plant's closing was $1,397,-136. CST had paid at that time $1,396,369, an amount roughly 42% of the total contract price of $3,347,180. *Id.* at 103. The testimony reveals that nothing which was requisitioned or invoiced by NMS was unpaid by CST. *Id.* Nothing during the cross-examination of Mr. Bernstein disturbs this testimony (11/16/88 Trial Transcript, at 153–232).

#### C. *Delays*

Travelers claims that delays of the Government in approving certain plans, change orders by the Government (Defend-

ant's Contentions, 5/19/87, at 3–4), and CST's "failures to obtain timely approval of design drawings," (Pre–Trial Order, 10/14/87, at 14) caused NMS substantial hardship and justified NMS' plant closing. The evidence shows that there indeed were major delays caused by late government approvals of plans. CST itself "sustained delays and damages as a result of the government's delays in approving the design of CST, National and IMH." (11/16/88 Trial Transcript, at 157).

However, the evidence also shows that NMS itself contributed to some of the delays by the fact that "it did not meet the acoustical requirements as set out in the RFTP." (11/17/88 Trial Transcript, at 432). NMS "never really got into a swing of production because of the ... effects of the delay," *id.* at 446, such as "[l]aying off the labor force, having to retrain." *Id.* Mr. Solomon, Travelers' own witness, testified that those delays caused NMS "to layoff because we didn't have approval. We reduced the labor force after the acoustics test." *Id.* at 446. Thus, NMS' own failure to meet the Government's acoustical requirements, requirements which the Government later had to reduce, *id.* at 434, contributed to the costs and delays Travelers now claims justified NMS' plant closing.

Moreover, the evidence shows that NMS went ahead with construction any way when it failed to obtain government approval of its design. *Id.* at 447–48. Mr. Solomon testified that "as far as I know I had never seen a set of plans that said approved." *Id.* at 448. Instead, NMS proceeded to build "the prototype based on plans submitted to the Corps of Engineers" *id.* that had never been approved, even though the "[p]rototype was not supposed to be used for approval." *Id.* at 447. NMS, in effect, in failing to meet government requirement and obtaining government approval, was nonetheless building at its own risk. So while there were delays in government approval of design, and even nonapproval of design, NMS itself did not sustain the sort of delay that prevented it from performing what it was contracted to perform.

■ In sum, according to different trial testimony from different witnesses, it is fair to conclude that there were substantial delays caused by various parties, including NMS, for one reason or another. Contrary to Travelers' assertions, however, such delays do not give NMS the right to rescind its contract. For the reasons stated below, NMS was bound by the "proceed diligently" clause in the contract to continue performance.

### D. *The Disputes Clause Requirement to Proceed Diligently*

■ In *Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854 (2d Cir.1987), the Court of Appeals for the Second Circuit was faced with a similar situation as the situation at hand. There, a dispute arose concerning a contract between the contractor and the government of Israel for the production of certain air reconnaissance system. The contractor could not meet certain contract specifications and claimed in its defense that such specifications were "unrealistic and unreasonable." *Id.* at 855. (It should be noted that a similar claim is asserted here, that "[t]he acoustical experts we [NMS] hired to test advised us that based on window space specified by RFTP, the opening required by the heat, ventilation, air conditioning unit and other requirements that the RFTP out [sic], it was impossible to meet the acoustical requirements." (11/17/88 Trial Transcript, at 432)). The contractor proposed various modifications which, though orally approved by the Israeli Air Force, were apparently not approved by the government of Israel. Israel thus refused payment. The contractor submitted its claims to arbitration, pursuant to a provision requiring the contractor to "proceed diligently with the performance of this Contract" "pending the final disposition of any dispute hereunder." *Id.* at 856.

The contractor subsequently terminated the contract, pursuant to a provision in the contract allowing an aggrieved party to terminate in the event of a material breach. Thereafter, Israel terminated the contrac-

tor following the contractor's work stoppage.

As Travelers is now claiming, the contractor Recon also claimed that in spite of the disputes clause, the contract did not require it to continue performance because of Israel's failure to make certain payments. *Id.* at 857 & n. 3. Recon instead argued that requiring it to continue work pending arbitration would serve to read another contractual provision allowing either party to terminate because of the other party's material breach out of the contract. *Id.* The Second Circuit disagreed.

The Court stated that the contract "explicitly requires continuation of work 'pending the final disposition of any dispute.' A provision applicable only to non-material breaches would be superfluous, because [the contractor's] obligation to continue performance would not be legally diminished by such a breach even absent the clause." *Id., citing* J. Calamari and J. Perillo, *Contracts* §§ 11–22(a) (2d ed. 1977) and Corbin, *Corbin on Contracts* § 946 (1951 & Supp.1971). Thus, the contractor "is ... required to continue work pending the arbitration that it has initiated. Should the arbitrators find a material breach by [the · government], [the contractor] may then terminate under [the applicable provision authorizing termination because of the other party's material breach]." *Id.*[2]

The Second Circuit thus found that the contractor had to proceed diligently, as required under the contract, even though another provision in the same contract there specifically provided for termination by one party in the event of the other party's material breach. In this case, by contrast, there is no such provision allowing for termination due to material breach. There were delays, to be sure, but NMS itself contributed to some of the delay. Counsel for Travelers specifically admitted that "I think that contract is silent on walking off under any circumstances, as most are...." (11/16/88 Trial Transcript, at 196). Nonpayment being the only contractual ground which would allow NMS to walk off the job, and nonpayment not having been made out by Travelers, the court holds that NMS was obligated to proceed diligently pending its claim with the Corps of Engineers.

Aside from the various nonpayment defenses, Travelers also relies on delays as justification for NMS' plant closing in June 1974. Delays in this case were primarily caused by the Government, as Mr. Bernstein testified. (11/16/88 Trial Transcript, at 157, 158, 161). Because of the delays, work was performed over a substantially longer period of time than originally contemplated by either CST or NMS, causing both parties substantial financial burdens. On April 5, 1974, NMS then submitted a claim of $1.5 million for an increase in the contract price. (Defendant's Memoranda In Opposition to Plaintiff's Motions for Multiple Relief, 8/15/55, Defendant's Memorandum in Opposition to Motion # 1, at 13; 11/16/33 Trial Transcript, at 186, 224). CST at that time passed the claim on to the Government. *Id.* at 195. This claim was pending when NMS announced the permanent closing of its plant in June of 1974.

Travelers contends that the claim was made directly against CST (*Id.* at 224; Defendant's Memoranda In Opposition to Plaintiff's Motions for Multiple Relief, *supra*, at 13). According to Travelers, delays, even though caused by the Government through no fault of CST, would "not

---

**2.** The Court also disposed of the contractor's argument that it was not obligated to continued performance because of the doctrine of impossibility of performance. The Court refused to disturb the district court's finding that the contractor terminated the contract "not because of impossibility of performance or any other reason listed in its termination letter, but because of its arbitrable dispute with Israel concerning payment for modifications." *Recon/Optical, supra,* 816 F.2d at 858.

Travelers here claims nonpayment by CST, a claim refuted by Granite's showing that all claims requisitioned by NMS were ultimately paid. But even if nonpayment were a viable defense supported by evidence at trial, it would not make out a defense of impossibility or impracticability, *Recon/Optical, id.,* as claimed by Travelers (Pre–Trial Order, 10/14/87, at 26). Travelers would have a claim only under the contract, however, if it had been successful in showing that CST failed to make requisite payments to NMS. *See* Article III of the CST/NMS subcontract.

affect CST's contractual liabilities to NMS." (Defendant's Pre–Trial Memorandum, at 15). However, "[p]otential damage from delay is inherent in any construction contract.... When the party causing the delay is the United States Government, and the contract is the standard government contract, it is impossible ... to find an equitable reason why a prime contractor, without fault and without option and without right of reimbursement from the Government, should have to compensate his subcontractor for damages resulting from delayed performance." *McDaniel v. Ashton–Mardian Co.*, 357 F.2d 511, 517 (9th Cir.1966).[3] The evidence shows that CST had passed NMS' claim on to the government, and that CST was awaiting the government's response to the claim.

Mr. Bernstein testified that "if the government increased it, I [CST] would pass on the increase to them [NMS]." (11/16/88 Trial Transcript, at 224).[4]

The primary case relied upon by Travelers, *United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302 (2d Cir.1955), is inapposite to the case at hand. The facts of that case are wholly distinguishable from the facts of the present case. There, the court found that the government's termination of the contractor was arbitrary and wrong, because 1) the contractor had incurred large costs in its efforts to comply with numerous change orders issued by the government; 2) the government was bound by the partial payments provisions to make what the Court deemed to be mandatory and not discretionary payments, *id.* at 308–

---

**3.** The Court also stated that there is no authority to support the "proposition that, absent express or implied contract provision therefor, the subcontractor can recover from the prime contractor for delays which are not caused by the fault of the latter." *McDaniel, supra,* 357 F.2d at 514 n. 2. *Cf. Quaker–Empire Constr. Co. v. D.A. Collins Constr. Co.,* 88 A.D.2d 1043, 452 N.Y.S.2d 692 (3rd Dep't 1982). In this case, relied on by Travelers, the court found sufficient evidence to support the finding that the prime contractor's "delay and faulty performance prevented timely and economical completion of plaintiff's work under its subcontract." *Id.* 452 N.Y.S.2d at 693–94.

The prime contractor there was found to have furnished to the subcontractor "erroneous field measurements," to have delayed the "completion of final grading of the road shoulders," apparently a precondition to much of the subcontractor's own performance, to have neglected to "properly position gaps in the concrete bridge", etc. *id.* at 694. On those facts, the New York state court found it irrelevant to the prime contractor's liability whether the state or other third parties may have contributed to some of the delay, clearly because the prime contractor itself was guilty of most of the delays. No such case has been made out against CST here.

*W.F. Magann Corp. v. Diamond Mfg. Co.,* 580 F.Supp. 1299 (D.C.S.C.1984), *aff'd in part, rev'd in part,* 775 F.2d 1202 (4th Cir.1985), a case involving a proceed diligently clause where the court found that the prime contractor's prior breaches justified the subcontractor's rescission, can also be distinguished from the present case. The facts there clearly show that the subcontractor's work of dredging for the construction of a navigable channel system was made impossible by misclassification of sand material by the government in its Design Memorandum. *Id.* at 1306. The requirement of a certain side slope

was therefore difficult to meet. Numerous problems arose from the dredging work. *Id.* at 1310. The general contractor and the government had in their possession all along the Design Memorandum demonstrating that the sideslope specifications as well as the soil classification were defective, while the subcontractor was never provided with such information. *Id.* at 1311, 1312. On those facts, the court found that whether or not the breach, resulting from defective specifications, was caused by the general contractor or the government, the subcontractor had the right of rescission. *Id.* at 1315.

The facts in our case simply do not show CST to be guilty of the sort of reprehensible acts and omissions which were made out against the prime contractor in the *Magann* case.

**4.** *See Vermont Marble Co. v. Baltimore Contractors, Inc.,* 520 F.Supp. 922 (D.D.C.1981). The court found that the clause "time is of the essence" in the subcontract did not give the subcontractor the right to rescind on the basis of delay, *id.* at 928, but that the subcontractor, instead, was bound by a similar disputes provision as the one present here. The court also found that the subcontractor did not make a claim for additional compensation that was unmet by the general contractor. It noted however, that even if a particular letter, demanding " 'payment in full of all excess costs incurred to date for the delays thus far suffered,' " *id.* at 928–29 n. 8, and threatening " 'not to proceed unless and until a proper and equitable adjustment in price had been achieved and agreed upon,' " did in fact amount to such a claim, "it is clear that [the general contractor] did not refuse the claim; rather [the general contractor] made an effort to incorporate [the subcontractor's] loss in the claim it [the general contractor] had pending before the [government]." *Id.* That is precisely what CST has done in this case.

09, 315; 3) when the contractor presented invoiced requests for such partial payments, the government advised the contractor that the payments would be made, *id.* at 305; 4) the contractor continued requests for partial payments and warned the government that it would be unable to continue production until a payment was made, *id.* (note: this warning was made following a certain change order issued *by the government* which "required retooling of from 60 to 90 days—*during which there could be no production*—and expenses of approximately \$120,000." *id.* (emphasis added)); 5) the government continued talks and negotiations with the contractor and sent an investigative production team to study the situation and to work out a partial-payment schedule, *id;* 6) the team concluded that a partial payment would allow the contractor to perform, *id;* 7) and yet despite such promises, the government terminated its contract with the contractor.

The facts in *Lennox* reveal that the contractor was not the one that permanently stopped performance. It did not comply with the delivery schedule, but it was still in the process of talking with the government. Thus, the standard disputes clause of the contract was never triggered and was never the issue in the case. Because the government was the one that terminated the contract after promises of partial payments and while negotiations were still continuing, the partial payments clause was the clause occupying center stage in that case. The court found that the government failed to make the mandatory partial payments, *id.* at 306–07, and that it was "*solely* because of that default that defendant could not thereafter have performed." *Id.* at 307 (emphasis added).

The facts adduced from trial in this case, as discussed above, fail to present such a picture. NMS failed to requisition for design payments as required by the contracts and therefore cannot use that defense for justification. Payments requisitioned by NMS were made out by CST. Delays were caused primarily by the government. NMS itself contributed to the delays. NMS proceeded with its work in spite of delays in approval of plans by the government—plans which were never in fact approved—thereby casting doubt on Travelers' claim that the government so substantially delayed and impeded NMS' work that such delays should rise to the level of justification for NMS' June 1974 plant closure.[5]

## III. CONCLUSION

The facts as set forth and described by the court in the case, together with the requirement that the contractor abide by the "proceed diligently" clause, *see Recon/Optical, supra,* 816 F.2d at 856–57, lead the court to rule that 1) NMS was required to proceed diligently and that the plant closure in June 1974 was a breach of its contract with CST; 2) NMS' failure to proceed diligently constitutes unjustifiable default. Because a surety's obligations arise upon default of its principal, *see e.g., Balboa Ins. Co. v. United States,*[6] 775 F.2d 1158, 1161 (Fed.Cir.1985), Travelers' bond obligations were triggered upon its principal's unjustifiable default in June 1974.

**5.** *See, e.g. Sancolmar Industries, Inc.,* 74–1 BCA (CCH) ¶ 10,391, Board of Contract Appeals Decision, ASBCA Nos. 16478 and 16479, Nov. 19, 1973 (Contractor claimed its default was justified because of the government's suspension of progress payments and because of defective contract drawings, *id.* at 49,057–49,058. The Board found that the contractor had "not shown excusable delay for its default" and that under the disputes provision of the contract, the contractor was bound to proceed diligently pending final decision of its disputes. *Id.*); *First Line Mfg. Inc.,* 83–1 BCA (CCH) ¶ 16,394, Board of Contract Appeals Decision, ASBCA Nos. 24443 and 24444, March 16, 1983 (Where the contrac-

tor had announced that it was ceasing work and closing operations, the government could terminate the contract prior to the due date. The government there had made substantial progress payments and the court was unpersuaded that "undercapitalization" or "insolvency" excused the contractor's failure to perform. *Id.* at 81,501).

**6.** "When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bond." *Balboa Ins., supra.*