**GRANITE COMPUTER LEASING CORP., Plaintiff-Appellee,**

v.

**The TRAVELERS INDEMNITY COMPANY, Defendant-Appellant.**

**No. 1136, Docket 89-7141.**

United States Court of Appeals, Second Circuit.

Argued May 11, 1989.

Decided Jan. 22, 1990.

Lauren J. Wachtler, New York City (Shea & Gould, New York City, of counsel), for plaintiff-appellee.

Peter N. Wang, New York City (Freidman, Wang & Bleiberg, New York City, James H. Reily, Max E. Greenberg, Cantor, Trager & Toplitz, New York City, of counsel), for defendant-appellant.

Before KEARSE, CARDAMONE, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

The Travelers Indemnity Company ("Travelers") appeals from a judgment of the United States District Court for the Southern District of New York (Motley, Judge) granting the motion of Granite Computer Leasing Corp. ("Granite") for a directed verdict following a jury trial. We believe that the evidence presented raised questions of fact for the jury and thus that Granite was not entitled to prevail as a matter of law. Therefore, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

I.

In March 1973, Community Science Technology, Inc. and Community Science Technology Development Corp. (together "Community"), were awarded a contract by the United States Government for the manufacture and installation of prefabricated modular housing units at seven Air Force bases. In April 1973, Community entered into a subcontract with National Modular Systems Corp. ("National") for National to supply 330 such units for three of the Air Force bases for a total fixed price of $3,347,180. Pursuant to the terms of the subcontract, National obtained a surety bond from Travelers, which named National as the principal and Community as the obligee.

From the outset, the project experienced significant delays. According to Travelers, the delays resulted, *inter alia*, from the government's failure to approve National's design drawings for the housing units. In June 1973, Community submitted National's detailed drawings of the housing units to the government, which drawings the government had approximately thirty days to review as provided in its notice to proceed. According to David Solomon, a former vice-president of National, the government never formally approved any of National's designs for the housing units. Solomon testified that National eventually decided to commence limited production of the units based on the government's review of a prototype.

In addition, testimony was presented that delays resulted from the government's deficient specifications and from the government's failure to timely approve National's use of alternate sources of materials used to construct the modules. However, other evidence suggested that National's own failure to meet certain specifica-

tions for the acoustical requirements of the modules also contributed to the delays.

According to Solomon, the government's delays had a severe financial impact on National, in part due to National's assembly-line method of producing the housing units. Its plant in Chester, New York contained two assembly lines, each with various stations at which components of the housing units were manufactured. Delays at any one station held up the next sequential stage of construction. As a result of the various delays, National claimed to have had increased labor costs due to 1) a rise in wages which occurred after the date on which National had estimated completion of its work and 2) the loss of its "previously experienced learning curve, since many of its more capable employees found other employment during [several lay-offs necessitated by the delays], and other employees lost their previously-developed degree of proficiency." National also claimed to have experienced increased costs for materials.

According to the record evidence, on several occasions National warned Community and the government that the delays were causing it serious financial hardship, threatening its ability to continue production. National wrote Community on April 5, 1974 and again on May 20, 1974 seeking an increase in the subcontract price. National warned that it might "be forced in the very near future to cease its performance under the supply contract and to close its doors unless it receive[d] a significant cash infusion from [Community] or the Government prior to final resolution of National's claim." Pursuant to the terms of

the subcontract,[1] Community promptly transmitted National's claim to the government for review by the government's contracting officer.[2]

On June 21, 1974, two and a half months after its first written complaint to Community, and while National's claim for an adjustment of the contract price still was pending, National, apparently due to its financial plight, ceased operations at its production plant. Upon learning of the plant closing, the government threatened to terminate Community from the prime contract if National did not resume production by July 8, 1974 (later extended to July 15, 1974). At a June 25, 1974 meeting between representatives of Community and the government, the government rejected Community's request to expedite National's claim.

On June 27, 1974, Community's general counsel spoke with representatives of Travelers, the surety for National, in an effort to secure additional financing for National. Travelers, however, refused to provide funding, claiming that National was not at fault in ceasing operations. Subsequently, on June 28, 1974, Community sent National a written notice of breach with fifteen days to cure, as provided in the subcontract.

Eventually, Community agreed to advance National up to $350,000 (later increased to $2,500,000) so that National could reopen its plant. The terms of the advance were contained in a financing agreement between Community and National dated July 8, 1974. The agreement explicitly withdrew the June 28 notice of breach. Thereafter, National reopened its

---

1. Article II of the subcontract provided as follows:

In the event work of National is delayed by an excusable delay as defined in General Provision 5(d)(1) of the Prime Contract (substituting National for the term "Contractor"), National shall notify Contractor in writing of the nature and cause of such delay in such time as shall enable Contractor to present a claim to the [Corps of Engineers] for extension of time in accordance with said General Provisions, and Contractor shall submit such claim in form and manner and within such time as shall enable Contractor to make timely claim therefor from [Corps of Engineers].

2. On April 22, 1974, National also had submitted directly to the government a "Request for Extraordinary Contract Relief" in the amount of $750,000. According to National, the purpose of this request was to obtain an advance from the government on a portion of the $2,700,000 claim submitted to Community. Such requests may be granted when the requested relief is essential to the national defense. On June 17, 1974, the government notified National that it had rejected National's request for extraordinary relief as not essential to the national defense.

plant and completed production in September 1975, eighteen months beyond National's original estimated date for completion.

In December 1980, Community and the government reached a settlement for the additional expenses incurred by Community and its subcontractors for government-caused delays. Under this agreement, the total prime contract price was increased by approximately $2.8 million, of which $743,000 was allocated to National's claims. Subsequent demands upon National and Travelers for repayment of the funds for which Community was not reimbursed by the government were rejected.

Community assigned its claim against National under the July 8, 1974 financing agreement to Great American Insurance Company, which in turn assigned the claim to Granite. In 1981, Granite filed suit in the district court under diversity jurisdiction to recover the balance due on the funds advanced by Community to National.[3] Granite maintained that National's 1974 plant closure constituted a default under the subcontract, thereby triggering Travelers' obligations as surety to provide financing for National or to ensure National's performance. Granite's complaint also sought an award of prejudgment interest, costs, and punitive damages for Travelers' alleged bad faith.

In 1984, the district court granted summary judgment in favor of Travelers. *Granite Computer Leasing Corp. v. Travelers Indem. Co. ("Granite I")*, 582 F.Supp. 1279 (S.D.N.Y.1984). Upon appeal by Granite, we vacated the judgment and remanded. *Granite Computer Leasing Corp. v. Travelers Indem. Co. ("Granite II")*, 751 F.2d 543 (2d Cir.1984). Subsequently, a series of hearings and confer-

ences was conducted by the district court in an attempt to narrow the issues for trial.

The case proceeded to trial before a jury, and, after all the evidence had been presented, each side moved for a directed verdict. The district court granted Granite's motion for a directed verdict as to Travelers' liability under the bond. *Granite Computer Leasing Corp. v. Travelers Indem. Co. ("Granite III")*, 702 F.Supp. 415, 423 (S.D.N.Y.1988). The claims for punitive damages and attorneys' fees went to the jury and an award was returned in favor of Granite. The total judgment, including prejudgment interest, was for $3,595,795.29. This appeal followed.

II.

■ We first address Travelers' challenge to the district court's pretrial ruling that the disputes clause of the prime contract was applicable to National.[4] The disputes clause provided that, in the event of a dispute arising under the prime contract, the contractor (Community) was to proceed diligently with performance of the contract pending resolution of the dispute by the government's contracting officer.[5] We agree with the district court that this clause also was applicable to National since the subcontract's detailed provisions for submission of excusable delay claims to the government evidenced the parties' intent to incorporate the disputes clause into the subcontract. *See, e.g., supra* n. 1. Thus, National was obligated to submit its claim for additional compensation and time extensions to Community, who then was required to pass it on to the government. Subject to the limitations discussed below, we believe that National did have a duty to

---

**3.** Granite and Travelers stipulated that the amount not repaid to Community under the July 8, 1974 financing agreement was $1.25 million.

**4.** Among the other issues decided by the district court in pretrial opinions were 1) that California law governed the trial of the action; and 2) that the bond issued by Travelers was a performance bond obligating Travelers to ensure actual performance in the event of National's default. We find no fault with these rulings.

**5.** The disputes clause of the prime contract provided in pertinent part that:

> any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer.... Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

continue its performance under the contract pending resolution of its claim.

### III.

We next turn to the district court's grant of a directed verdict. "A directed verdict is proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir.1986) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). In applying this standard, the district court's task is not to try issues of fact, but to determine if there are any issues of fact to be tried. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987).

█ Herein, a directed verdict was granted in favor of Granite, the party having the burden of proof on the question of Travelers' liability under the bond. It is rare that the party having the burden of proof on an issue at trial is entitled to a directed verdict. *Service Auto Supply Co. of Puerto Rico v. Harte & Co.*, 533 F.2d 23, 24–25 (1st Cir.1976); *Powers v. Continental Casualty Co.*, 301 F.2d 386, 388 (8th Cir.1962). A verdict should be directed in such instances only if the evidence in favor of the movant is so overwhelming that the jury could rationally reach no other result. *See United California Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1356 (9th Cir.1977); *Mihalchak v. American Dredging Co.*, 266 F.2d 875, 877 (3d Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 157 (1959). As discussed below, applying these principles to the facts of this case, we think there was a triable issue of fact for the jury on which the evidence was not overwhelmingly in favor of Granite.

█ Under basic suretyship law, a surety's obligations cannot be more burdensome than those of its principal, and "where the principal is not liable on the obligation, neither is the guarantor." *United States Leasing Corp. v. duPont*, 69 Cal.2d 275, 444 P.2d 65, 75, 70 Cal.Rptr. 393, 403 (1968); *Brunswick Corp. v. Hays*, 16 Cal.App.3d 134, 138, 93 Cal.Rptr. 635, 637 (1971); Cal.Civ.Code § 2809 (West 1974). In the case of a construction bond, a surety is liable when a principal has defaulted on the contract. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir.1985); *Pacific Employers Ins. Co. v. City of Berkeley*, 158 Cal.App.3d 145, 152, 204 Cal.Rptr. 387, 390 (1984).

█ Under a performance and completion bond, a surety generally has two options upon its principal's default. First, the surety may undertake to complete the principal's work itself; this obligation may be satisfied by the surety funding the principal to complete its work. *United States v. Seaboard Sur. Co.*, 817 F.2d 956, 959 (2d Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 115 (1987); *Aetna Casualty & Sur. Co. v. United States*, 845 F.2d 971, 975 (Fed.Cir.1988). Second, the surety has the option of paying the obligee under the bond its damages, essentially the obligee's cost of completion. *Seaboard Sur. Co.*, 817 F.2d at 959.

In the instant case, Travelers chose neither to fund National nor to reimburse Community for funds advanced to National because Travelers claimed that National had not defaulted on the subcontract. At trial, Travelers argued, *inter alia*, that National's plant closure was justified in light of government delays in design approval which, through Community, constituted a material breach of the subcontract thereby relieving National of its duty to perform. The district court rejected this defense as being barred by the disputes clause of the prime contract. The court further held that the only type of contractual breach that would have justified National's plant closing was nonpayment by Community. Since the court found that Community paid substantially all claims requisitioned by National, the court ruled that National was "obligated to proceed diligently pending [resolution of] its claim with the Corps of Engineers." *Granite III*, 702 F.Supp. at 421.

### A. Disputes Clause of the Prime Contract

We agree that National was bound under the disputes clause of the prime contract to submit its claim to Community and to continue working even if the subcontract had been breached by the government's delays in design approval. In *Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854 (2d Cir.1987), the court was faced with a "proceed diligently" provision similar to that found in the prime contract herein. An agreement between a military contractor and the Israeli Ministry of Defense provided that in the event of a dispute under the contract a claim was to proceed to arbitration, and that the contractor "agrees to proceed diligently with the performance of this Contract...." *Id.* at 856. A dispute arose between the contractor and Israel when Israel refused to pay for changes which Israel claimed it had not requisitioned. Although the contractor submitted a claim to arbitration, it simultaneously terminated its performance. The court held that the "proceed diligently" provision obligated the contractor to continue its performance even though it might subsequently be found that Israel was in material breach by failing to pay for the requested changes. *Id.* at 857.

In an earlier district court case, *Vermont Marble Co. v. Baltimore Contractors, Inc.*, 520 F.Supp. 922 (D.D.C.1981), a stonework subcontractor had rescinded a subcontract with a prime contractor because of alleged delays in the preparation of a worksite. A provision in their subcontract provided that if the subcontractor was delayed in the performance of its work, it "shall" submit a claim in writing to the prime contractor. *Id.* at 924. The court found this language to be mandatory, and, since the subcontractor had not submitted a claim, it held that rescission was not an option available to the subcontractor.[6] In dicta, the court stated that "even 'unreasonable' delays are not material breaches of this subcontract" which would justify

rescission. *Id.* at 928. It noted, however, that under the subcontract rescission would be an available remedy if the disputes resolution procedure failed of its purpose. *Id.* According to the court, this could occur if the prime contractor "refused to pay a properly presented claim." *Id.*

■ We believe *Recon* and *Vermont Marble* support the view that the disputes resolution clause required National to submit its claim pursuant to the disputes resolution procedure. We further believe the government's alleged delays in design approval would not by themselves constitute material breaches which would justify National closing its plant. Nonetheless, we do not think that National was bound to proceed diligently under all circumstances.

■ As suggested by the court in *Vermont Marble*, if the disputes resolution procedure had failed of its purpose, then National may have been justified in stopping work under the contract. On this issue, the evidence was not overwhelmingly in Granite's favor. Unlike the contractors in *Recon* or *Vermont Marble*, National availed itself of the disputes procedure by submitting a claim for an adjustment of the contract price and attempting to proceed diligently pending resolution of the claim. The claim first was submitted in early April 1974. Despite National's subsequent warnings over a two and one-half month period that it was in dire need of financial assistance, the government had failed to resolve the claim by the June 21, 1974 plant closing. Although the government had not refused to pay National's claim, such refusal was not the sole way in which the disputes procedure could have failed of its purpose. The government's *delays* in responding to the claim also may have been sufficient to justify National's actions, especially in light of evidence that National already was suffering serious financial distress due to the government's delays in

---

6. Herein, mandatory language similar to that in *Vermont Marble* is found in both the subcontract (In the event of excusable delay, "National *shall* notify Contractor in writing") and in the prime contract ("[A]ny dispute ... arising under this contract which is not disposed of by agreement *shall* be decided by the Contracting Officer.").

design approval.[7]

Thus, Travelers' liability under the bond turned upon the resolution of two factual questions. First, did the government, through Community, breach the subcontract by its actions or inactions prior to June 21, 1974, in connection with the design or construction aspects of the subcontract? Second, if there was a breach of the subcontract, was the government's delay in responding to National's claim unreasonable? If the answer to both of these questions was in the affirmative, then there would have been a material breach of the subcontract thereby discharging National's duty to perform. Having no duty to perform, National could not have been in default when it ceased production on June 21, 1974. Consequently, since the obligations of a surety arise only upon the default of the principal, Travelers would not have been liable under the bond for monies advanced by Community to National.

If, however, the answer to either of the above questions was in the negative, there would not have been a material breach of the contract discharging National's duty to perform. Consequently, National's total cessation of production on June 21, 1974, would have been a default under the subcontract. As such, Travelers' obligations under the bond would have been triggered.

Which of these outcomes should prevail depends upon determinations by a fact finder.

### B.  Limits Within The Subcontract

■ The disputes clause of the prime contract aside, we do not think that the subcontract limited National's right to terminate to instances of nonpayment by Community. Admittedly Section 1 of Article III of the subcontract provided that "National may stop work if any progress payment is not made ... within ten (10) days after the due date...." Although this provision listed no further ground for which National could cease performance, it did not thereby establish nonpayment as the sole contractual ground for termination. Had it been contemplated that no other contractual ground could justify termination by National, the contract could easily have provided that "National may stop work only if any progress payment is not made." Interpreted as one express justification which could warrant National terminating the subcontract, this provision did not preclude National from terminating for other reasons, such as government delays in claim resolution.

### IV.

We have considered Travelers' remaining arguments and find them to be without merit.

For the foregoing reasons, the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.

■

---

**7.** The district court, in suggesting that Community could not be held accountable for government-caused delay damages, relied upon McDaniel v. Ashton–Mardian Co., 357 F.2d 511 (9th Cir.1966). We believe McDaniel to be inapposite. In McDaniel, the court construed a standard government contract to prevent recovery against the United States for increased costs of construction due to government change orders. The court denied a subcontractor's claim against the prime contractor for delay damages caused by the government's change orders.

An underlying basis for the holding in McDaniel was that it would have been inequitable to allow the subcontractor to recover against the prime contractor for government-caused delay damages since the prime contractor had no "right of reimbursement from the Government." Id. at 517. Such was not the case herein. Community was free to pursue claims against the government for delay damages. Indeed, under Community's December 1980 settlement with the government, Community received an increase in the prime contract price for "delays caused by the Government for late approval of design[s] ... [and] continuing design revision." Under these circumstances, we think Community could be held accountable to National for government-caused delays. See United States for Use and Benefit of Otis Elevator Co. v. Piracci Const. Co., 405 F.Supp. 908, 910 (D.D.C.1975).