**METRIC SYSTEMS CORPORATION,**
**Plaintiff,**

v.

**McDONNELL DOUGLAS**
**CORPORATION,**
**Defendant.**

**No. 90–30199–RV.**

United States District Court,
N.D. Florida,
Pensacola Division.

Jan. 14, 1994.

William H. Clark, Jessie Rigby, Clark, Partington, Hart, et al., Pensacola, FL, for plaintiff.

W.H.F. Wiltshire, Harrell, Wiltshire, et al., Pensacola, FL, Thomas A. Hawbaker, Bryan Cave, Irvine, CA, for defendant.

### ORDER

VINSON, District Judge.

Pending is the defendant's motion for partial summary judgment. (Doc. 66). For the reasons set forth herein, the relief requested is GRANTED.

### I. BACKGROUND

This is a breach of contract action between a prime contractor, McDonnell Douglas Corporation ("MDC"), and its subcontractor, Metric Systems Corporation ("Metric"). Two contracts are at issue: one to build a cargo loading device and one to build an engine trailer, both to be used by the United States Air Force. Metric contracted to design and manufacture both devices for MDC. Neither contract came to fruition.

MDC terminated both contracts for default, which led Metric to sue for breach of contract and MDC to counter-claim, also for breach. This court's jurisdiction is founded

upon diversity of citizenship. MDC has now moved for summary judgment on Count I of the complaint and Count I of the counterclaim, which concern only the contract for the cargo loading device.

Except where noted, the following facts are not in dispute. In 1978, MDC contracted to supply, on a firm-fixed price basis, sixty KC–10A aircraft to the Air Force. The KC–10A is the military version of the DC–10 commercial jet airliner. The KC–10A aircraft's primary mission is in-flight refueling of other aircraft; its secondary mission is to transport cargo. The KC–10A is not a ramploader, meaning that it does not have a cargo door which can be lowered and raised for use as a ramp to load and unload cargo. Because the main cargo door of the KC–10A is about seventeen feet off the ground, ground support equipment must be used to lift cargo onto, and lower it off of, the aircraft.

The Air Force later decided that it wanted some of the KC–10A aircraft to be equipped with an on-board loading device. Such a device would fit inside the cargo compartment of the aircraft and would enable the crew of the KC–10A to transfer cargo to and from the plane without ground support personnel or equipment. In 1987, the Air Force instructed MDC to supply a limited number of on-board loaders ("OBLs") designed specifically for the KC–10A. The Air Force desired that this work be done by a subcontractor. At the same time, the Air Force instructed MDC to modify ten existing KC–10A aircraft to accommodate the OBL. The prime contract between the Air Force and MDC, for both the design and manufacture of the OBL and the modification of the KC–10As, proceeded on a firm-fixed price basis.

MDC then prepared Request for Proposal No. C1–156–KC10A–7335, dated December 1, 1987, which solicited a firm-fixed price quotation for the full scale engineering effort required to design, develop, assemble, test, and deliver an OBL prototype. The same Request for Proposal sought a firm-fixed price quotation for a production option of ten additional OBL units. The Request for Proposal included "Terms and Conditions" that would later form the operative terms of the OBL contract between MDC and Metric.

Section 2.B of the Terms and Conditions, "Type of Specification," provides:

> Subcontractor recognizes and agrees that the applicable specifications incorporated herein are performance type specifications which may not define in detail the work required or how the work will be accomplished within the overall scope of such specifications. Accordingly, it is agreed by Subcontractor that any such detailing of the actual design of the Products to be delivered hereunder, and all revisions thereto, shall not be considered as changes, or otherwise entitle Subcontractor to additional compensation.

(Doc. 73 Ex. 1 at p. 9).

The changes clause is set forth in Section 6 of the Terms and Conditions. It authorizes MDC, at any time, to make changes within the general scope of the agreement that affect drawings, designs or specifications. *Id.* at p. 23. According to the changes clause, the subcontractor's entitlement to additional compensation (beyond the firm-fixed contract price) for any changes depends upon whether the changes are ordered during the design and development phase or during the production phase of the project. For changes ordered by MDC during the design and development phase, the subcontractor is entitled to additional compensation only if MDC received a price adjustment for the same change in its prime contract with the Air Force. For changes ordered by MDC during the production phase, that is, after the Air Force accepted the first KC–10A with an installed OBL, the subcontractor is entitled to an equitable adjustment in the price.

The disputes clause, Section 12 of the Terms and Conditions, provides:

> A. Pending the final resolution of any dispute involving this contract, Subcontractor agrees to proceed with performance of this contract, including the delivery of goods, in accordance with MDC's instructions.
>
> B. Subcontractor shall submit to MDC's authorized Purchasing Representative a written demand for MDC's final decision regarding the disposition of any dispute between the parties relating to

this contract, unless MDC, on its own initiative, has already rendered such a final decision. Any MDC final decision shall be expressly identified as such, shall be in writing, and shall be signed by MDC's authorized Purchasing Representative, except that MDC's failure to render a final decision within ninety (90) days after receipt of Subcontractor's demand shall be deemed a final decision adverse to Subcontractor's contentions.

C. MDC's final decision shall be conclusive and binding regarding the dispute unless Subcontractor commences an action to contest such decision within ninety days following the date of the final decision or one (1) year following the accrual of the cause of action, whichever is later.

(Doc. 73 Ex. 1 at p. 36).

The Request for Proposal instructed prospective subcontractors that "[y]our response must indicate acceptance of or exception to all terms, conditions and special provisions set forth in Attachment B-2 [the Terms and Conditions]. If exception is taken, specifically identify the item, your reasons for the exception and where appropriate, furnish recommended alternative language." (Doc. 73 Ex. 2). Metric responded with a firm-fixed price proposal dated February 15, 1988. The cover letter to Metric's response was signed by Alfred F. Hackett, Jr., director of Metric's aeromechanics division. Metric's response took exception to certain terms set out in the technical documents of the Request for Proposal, but Metric stated that "[t]here are no exceptions to the terms and conditions contained in the model contract, Attachment B-2 of the Request for Proposal." (Doc. 73 Ex. 3).

By letter dated March 1, 1988, MDC informed Metric of minor modifications in the project requirements and invited Metric to submit a revised proposal. The same letter advised Metric to "revisit the DAC Terms and Conditions to ensure that no problems/uncertainties exist which could cause a delay or misunderstanding in the event of

contract award." (Doc. 73 Ex. 4). Metric responded with a revised proposal on March 4, 1988. This final revised offer took exception with none of the Terms and Conditions.

Metric was the low-bidder and was awarded the OBL subcontract. On April 6, 1988, MDC issued to Metric letter contract No. L-156-88-056, by which MDC placed an order for one OBL, with an option to purchase up to ten units. (Doc. 73 Ex. 6). The letter contract incorporated by reference the Terms and Conditions of the Request for Proposal, and it stated that it would later be superseded by a "definitized contract." Metric accepted the order by executing copies of the letter contract and returning them to MDC. Hackett executed the letter agreement on behalf of Metric on April 12, 1988.

The letter contract was superseded by a purchase order dated January 16, 1989. (Doc. 73 Ex. 7). This purchase order stated that it was issued under and governed by Agreement No. B-140-88-020, which, in turn, incorporated terms and conditions identical to those included in the Request for Proposal. (Doc. 73 Ex. 8). Metric executed a copy of Basic Agreement No. B-140-88-020 and returned it to MDC on June 15, 1989.[1]

Work continued on the OBL project from the Spring of 1988 until January 1990. In August 1988, Metric hosted a preliminary design review ("PDR") at its facilities in Fort Walton Beach, Florida. This meeting was attended by representatives of Metric, MDC, and the Air Force. At this meeting, representatives of the Air Force informed Metric and MDC that the Air Force wanted the onboard loader to be able to load and unload cargo at various intermediate heights, a capability not possessed by the device as designed at that point. This represented a major modification of the OBL specifications.

The addition of the intermediate load/unload capability was negotiated as a firm-fixed price modification of both the prime contract between the Air Force and MDC, and the subcontract between MDC and Metric. This

---

1. It is not clear from the record why the Basic Agreement was not returned to MDC by Metric until June 1989, when the document states that it was entered into on April 6, 1988. However, this fact is not material to the disposition of this motion.

modification, known as the "R2 Modification", extended the subcontract schedule and increased the price from $1,397,463.92 to $1,961,797.92.

A second preliminary design review, incorporating the R2 Modification, was hosted by Metric on April 5–6, 1989. According to James Thomas, MDC's program manager and program engineer on the OBL project, MDC expressed its concern at that meeting that Metric did not have enough people working on the OBL project to complete it on schedule. Thomas states that Metric representatives, including Alfred Hackett, director of Metric's Aeromechanics Division, and Frank Horton, Metric's OBL program manager, assured him that the schedule was achievable and that Metric was searching for additional personnel to work on the OBL program.[2] (Doc. 73 at p. 8).

The next month Metric hosted a program management review for the OBL program, on May 23–24, 1989.[3] The meeting was attended by James Thomas and Frank Horton, the program managers for MDC and Metric, respectively; Hackett, Metric's director of aeromechanics; Jeffrey Bain, a Metric engineer; and Gary Southern and William Blount, contracts administrators for MDC and Metric, respectively. Minutes of the meeting reflect that MDC representatives expressed concern that Metric was behind schedule on supplying design drawings for the project and that Metric was insufficiently staffed to complete the drawings necessary for the project to proceed to the critical design review ("CDR") stage. Metric responded that additional staff were being added to assist with the drawings. There is no record in the minutes of Metric attributing any lack of progress to MDC. (Doc. 73 Ex. 14).

A second program management review was held on June 14, 1989. This meeting was attended by, among others, Thomas, Horton, Blount, and Bain (who had replaced Hackett as director of Metric's aeromechanics division). The minutes recount the items that were discussed at the meeting and conclude by stating that "[a]ll parties agreed that a fruitful [program management review] had taken place and that [Metric] was well underway toward a successful [critical design review]." (Doc. 73 Ex. 15).

Critical design review was held at Metric's facilities on August 1–3, 1989, and, by all accounts, was not "successful." The minutes of the critical design review, which were prepared by Metric, state:

> By early in the second day of the CDR, it was evident that Metric was not where they should be, and would need considerable effort to get back on schedule. DAC[4] did note that the actions taken to date were good but not timely. It was also noted that the drawings produced to date were CDR quality, but far behind in quantity.

(Doc. 73 Ex. 16).

During the CDR, a group of management personnel from MDC and Metric met to map out a recovery plan for the project. This group included Jack Crosthwait, MDC's general manager on the KC–10A program; Charles Johnson, a Metric vice-president; Bain; Thomas; Horton; Southern; and Blount. Crosthwait and Johnson agreed to a recovery plan which included Metric sending one of its engineers, Paul Gallagher, to MDC, where MDC would train him and assist him in performing stress analysis; MDC providing three design engineers to assist Metric with drawings; and MDC taking steps to expedite its approval of drawings submitted by Metric. The CDR ended with both sides agreeing that a major effort was required to get the program back on track.

Apparently, the recovery plan was initially successful. A monthly status report from

---

2. No minutes of the April 1989 preliminary design review meeting have been filed, nor is this meeting discussed in the lengthy affidavit filed by Jeffrey Bain on behalf of Metric. Minutes of the May 23–24, 1989, and the June 14, 1989, meetings have been filed. (Doc. 73 Exs. 14, 15).

3. This May 1989 meeting is also referred to as a "technical interchange meeting," although the minutes label it a "program management review."

4. "DAC" is an abbreviation for Douglas Aircraft Company, a division of McDonnell Douglas Corporation.

Metric to MDC, dated September 12, 1989, concludes by stating that "[t]he total recovery plan is well under way and making progress. With the current level of management attention and commitment by both parties the OBL should be able to be delivered as scheduled." (Doc. 73 Ex. 22). That report set April 1990 as the delivery date for the first OBL.

Any such progress was short-lived. By letter dated October 23, 1989, Metric advised MDC of "an impending significant program delay ... due to several actions of the last few weeks." (Doc. 72 Ex. 3). Metric proposed to extend the scheduled date for completion of detail drawings from December 4, 1989, to April 10, 1989, and to extend the date for delivery of the first OBL from April 30, 1990, to September 17, 1990. The October 23 letter, dubbed a "problem report", blamed the delay on changes ordered by MDC, as well as the loss of "critical engineering personnel" by Metric. *Id.* Concerning the latter, the October 23 letter states:

> Two members of the OBL design engineering staff recently resigned from employment with Metric. One individual was primarily responsible for the preparation of stress substantiation data, and will cause a significant program obstacle.[5] Also, other programs in the Aeromechanics Department with significantly higher DMS priorities continue to compete with the OBL for manpower requirements. Metric is currently searching for additional engineering manpower as a top priority to easing program shortages.

The letter concludes by stating: "Please be advised that Metric is aware of the seriousness of the situation. We will continue our efforts to increase the engineering manpower on the program." *Id.*

5. This individual was Paul Gallagher, the engineer who had been sent to MDC for training and assistance in performing stress analysis.

6. MDC cited the following deficiencies as grounds for the cure notice: (1) Metric is currently delinquent in design with less than 40% of drawings released; (2) Metric failed the August 1989 critical design review; (3) Metric has notified MDC that the CDR scheduled for November

MDC responded by suspending progress payments and by issuing a cure notice on October 25, 1989. MDC, through Gregory Hodgson, its buyer on the OBL subcontract, advised Metric that it considered "Metric's contractual performance failure/deficiencies, ... to constitute a condition that is endangering contract performance and jeopardizing the [OBL program]." (Doc. 72 Ex. 8).[6] The cure notice required Metric to submit to MDC, within ten days, a plan to cure these deficiencies in order to avoid a termination of the OBL subcontract for default.

Metric responded to the cure notice on November 6, 1989, by blaming MDC for the project delays. According to Metric's response to the cure notice, the most significant factors in causing the delay were MDC's demands for changes and requests for out-of-scope information and MDC's failure to provide Metric with important design information in a timely manner. (Doc. 72 Ex. 9 at pp. 1–2). Seeming to reverse field from its October 23 letter, Metric now suggested that the personnel changes of September and October were a blessing in disguise:

> It is [Metric's] belief that the recent termination/resignations have actually served to strengthen and solidify the OBL design function into a strong, cohesive, and dedicated team. It is now apparent that the engineers who resigned were not fully dedicated to the success of the program. This is not to say that the loss of three engineers within a week will not have a short-term impact.

*Id.* at p. 3.

The cure response summarized Metric's position as follows:

> [I]t is true we are delinquent; however, our major short-fall lies in the fact that we have permitted this situation to exist and continue to grow since mid–1988, without

1989 must be postponed until April 1990; (4) Metric has informed MDC that delivery of the first OBL will be delayed until September 1990; (5) Metric lacks the resources to perform stress analysis or to complete the data item requirements associated with this, because Metric's engineer who was being trained by MDC on this subject has quit; and (6) resignations/terminations in Metric's engineering department have resulted in "making worse an already acute manpower problem." (Doc. 72 Ex. 8).

constantly apprising [MDC] of each circumstance affecting schedule performance. [MDC], early on, over-powered [Metric], forcing us into a conciliatory mode of operation, by consuming us with requests, demands, etc., causing us to spend too much of our efforts reacting/responding. Frankly, it took something like [MDC's] "Cure Notice" to force [Metric] to study and document the underlying problems with the OBL program progress.

*Id.* Metric detailed what it considered to be out-of-scope changes in a series of eighteen attachments to the cure response.

Representatives of Metric and MDC met on November 17–18, 1989, in an effort to put the OBL program back on track. According to Hodgson, MDC's buyer on the OBL program, the parties discussed Metric's plans for filling existing vacancies and expanding its workforce, as well as a recovery schedule that MDC needed in order to negotiate a time extension on the prime contract with the Air Force.

A major program review meeting was then held on December 19–20, 1989. Bain, Metric's director of aeromechanics, states that MDC overwhelmed Metric at this meeting. According to Bain:

> MDC presented Metric with an insurmountable level of additional engineering effort to be required on the OBL program. MDC made it clear that it did not care whether the work was considered by Metric to be in-scope or out-of-scope. The level of effort added to the OBL program by MDC during this meeting represented, at a conservative estimate, a tripling of the scope of work required by contract. MDC's directions at this meeting demonstrated that it did not yet have a finalized performance specification, 18 months after contract award.

(Attach. to Doc. 93 at pp. 44–45). Bain states that MDC did not clarify inconsistent demands and did not offer to negotiate either schedule or monetary relief for the additional work it ordered at the meeting.

David Brown, an MDC engineer who was responsible for monitoring Metric's progress on the design of the OBL, attended the December 1989 meeting. According to Brown, at no time did any Metric representative make any request for additional information or instructions on how to proceed, nor did Metric identify any conflicts in the OBL specifications or performance specifications or performance requirements that were unattainable. (Doc. 70).

Also in December 1989, Metric began sending a series of letters to MDC demanding compensation for changes that Metric considered out-of-scope. These letters, referred to as "cost impact statements," correspond to the changes which were detailed in the attachments to Metric's cure response of November 6. Twelve of these cost impact statements are in the record. (Doc. 72 Exs. 40–51). They are dated from December 14, 1989, to January 2, 1990; obviously, then, several of them were received by MDC immediately before the December 1989 program meeting, and several were not received by MDC until after the meeting. Taken together, these twelve cost impact statements request additional compensation—beyond the contract price—in the amount of $535,316.61.

Metric halted all work on the OBL project on January 5, 1990. A job release of that date, signed by Blount and Bain, states: "Job revised to suspend all work. Place no further orders and perform no further work effective 1:00 P.M., 1/5/90." (Doc. 69 Ex. G). That same day Coy J. Scribner, Metric's president, sent a letter to Jack Crosthwait, general manager of the KC–10A program for MDC, informing MDC that Metric was suspending work on the OBL. (Doc. 69 Ex. F). The letter accused MDC of promulgating "vague, ambiguous and misleading specifications" and of "interpret[ing] and administer[ing] the OBL subcontract in a manner that would try to utilize Metric as an infinite, continuing, and on-going technical design and analysis resource." *Id.* The letter concludes:

> The OBL and the effort required to design it are substantially different now that [sic] what we originally proposed. It may now even be technically impossible to satisfy all of the requirements currently being imposed on Metric by [MDC]. Continually

changing specifications, additional studies, and analyses being imposed by [MDC] have and are preventing Metric from completing the OBL design.

With reluctance and much careful consideration I must conclude that we are unable to finalize the design of the KC–10 OBL due to the continual specification redefinition being imposed by [MDC] on Metric's Aeromechanic design team. Accordingly, we must suspend all efforts on our subcontract for the OBL program. However, we would be willing to continue on a cost-plus basis if you so desire.

*Id.* After January 5, 1990, Metric performed no further work on the OBL subcontract.

Metric's action prompted a meeting between representatives of the two companies at Metric's facilities on January 16, 1989. Attending on behalf of Metric were Coy Scribner, president; Charles Johnson, executive vice-president; Harry Fowler, vice-president; Bruce Whitewolf, counsel; J. Rankin Tippins, associate general counsel for Metric's parent company, Tech–Sym; and Jeffrey Bain, director of aeromechanics. Jack Crosthwait, general manager; Alice Rosenthal, and Darrel Stoskopf attended on behalf of MDC. Minutes of the meeting, prepared by Rosenthal, reflect that the parties discussed their opposing perceptions of what had caused the crisis in the OBL program, as well as options on how to proceed. *See* Doc. 69 Ex. I.

MDC followed up the meeting with a letter from Crosthwait to Scribner on January 22, 1990. (Doc. 69 Ex. J). This letter states that MDC understood Metric's position to be that it would not resume work on the OBL subcontract unless MDC either (1) recognized as compensable changes all of the eighteen attachments to Metric's cure notice response; (2) converted the contract from a firm-fixed price to cost-plus-fixed-fee basis; or (3) execute a partial termination for convenience to Metric for the design component of the contract. *Id.* Crosthwait states that MDC's position was that "any [MDC] directed change will result in a negotiated equitable adjustment upon submission of adequate and supporting documentation from Metric."

The letter continues that MDC has not issued a final determination on any of Metric's claims, nor has MDC dissuaded Metric from pursuing its rights under the contract. *Id.* "Further, any final decision by DAC can be appealed through dispute resolution as set forth in the contract." Crosthwait concludes by saying that "Metric is obligated to proceed with performance under this Contract" and that MDC is not prepared to convert the contract to a cost-plus-fixed-fee basis. *Id.*

Coy Scribner, Metric's president, responded by letter on January 30, 1990. (Doc. 69 Ex. K). Replying to Crosthwait's assurances that MDC would pay for any out-of-scope changes, Scribner states "[u]nfortunately, some [MDC] personnel assigned to our contract cling to the unconscionable and irrational position that, based on the non-standard changes clause in our subcontract, [MDC] can expand requirements without limit with no corresponding adjustment in price or delivery schedule." *Id.* Scribner repeated Metric's position that, because MDC continued to order substantial out-of-scope changes, Metric concluded that it was "pointless to continue." *Id.*

Scribner's letter took issue with Crosthwait's characterization of Metric's position regarding the conditions under which it would resume performance. "As for the options presented by Metric at our meeting, they were certainly not ultimatums nor did they even exhaust the available possibilities." *Id.* However, Scribner does not indicate in the letter what any other "available possibilities" might be. The letter concludes by saying:

Although it is difficult to see how the OBL will ever be designed and built if [MDC] continues on its present course of unending contact changes and expansions, we are willing to give it our best efforts under proper circumstances.

*Id.*

On January 25, 1990, the Air Force sent MDC a cure notice on the OBL prime contract. This cure notice refers to postponement of the critical design review from August 1989 to December 1989 to August 1990, and to Metric stopping work on January 5, 1990. The cure notice requested MDC to

submit a corrective action plan to the Air Force within ten days. By letter dated February 5, 1990, MDC informed Metric that it was terminating the OBL subcontract for default. (Doc. 72 Ex. 53). The letter states that this decision was based on Metric's response to the cure notice and Metric's "decision to breach the contract by unilaterally suspending work on January 5, 1990." *Id.*

Metric filed suit in this court on July 5, 1990. Count I of the complaint alleges that MDC breached the OBL subcontract by, *inter alia*, imposing out-of-scope changes without offering compensation, requiring premature submission of data not called for in the contract, issuing conflicting design specifications, suspending progress payments, and wrongfully terminating for default. MDC responded with a counter-claim against Metric, which alleged that Metric breached the OBL subcontract by missing deadlines and by halting work in January 1990.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993). Likewise, if reasonable minds could differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992).

On a summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1502 (11th Cir.1993). Furthermore, the court must consider the entire record in the case, and not just those pieces of evidence which have been singled out for attention by the parties. *See Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565, 1570 (11th Cir. 1987).

### B. Governing Law

Before addressing the merits of the motion, I note that there appears to be a question about the applicable law. A federal district court in a diversity action must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Accordingly, I must look to the choice of law rules of Florida in order to determine what substantive law applies to this action.

The OBL subcontract contains a choice of law clause which provides that "[t]his Agreement shall be construed and performance hereof shall be determined according to the laws of the State of California, United States of America." Under Florida

law, the law chosen by the contract applies so long as "there is a reasonable relationship between the contract and the state whose law is selected and the selected law does not conflict with Florida law or confer an advantage on a non-resident party which a Florida resident does not have." *Forzley v. AVCO Corp. Elecs. Div.*, 826 F.2d 974, 979 (11th Cir.1987). I find that a reasonable relationship exists between California and the OBL contract, in that much of MDC's OBL operations was located there, and many meetings concerning the contract occurred there.

I also find that no conflict exists between California law and Florida law. My resolution of this motion turns largely on principles of the law of contracts that are common to most, probably all, United States jurisdictions. The controlling principles at this stage of this case would be the same whether they were derived from California law, from Florida law, or from a general federal law of contracts. My application of these principles is informed by cases from California and from the myriad of federal courts that have confronted similar issues in adjudicating government contract disputes.

### C. *Merits of the Motion*

The time between the awarding of the OBL subcontract to Metric in early 1988 and Metric's work stoppage in January 1990 has given rise to a wealth of accusations between the parties. Metric maintains that MDC never offered it a fixed target to aim at, but rather, constantly revised the design specifications. This, in turn, required Metric to perform an enormous amount of out-of-scope work for which MDC was apparently unwilling to compensate. MDC, on the other hand, blames Metric for, essentially, getting in over its head on the OBL project, not assigning adequate personnel for the task, and falling woefully behind schedule.

As is abundantly clear from the evidence submitted by the parties, the question of where to place the blame for the OBL debacle raises factual disputes which cannot be resolved by summary judgment. I need not attempt to resolve those factual issues, however, to rule that MDC is entitled to summary judgment on the OBL contract claim and counter-claim.

MDC's argument is straightforward. MDC and Metric contracted for Metric to design and produce an OBL on a firm-fixed price basis. As a part of that agreement, Metric agreed to proceed with its work while any controversies involving the subcontract were resolved in accordance with the disputes resolution process set forth in the subcontract. Notwithstanding this commitment, Metric halted work in January 1990 and refused to proceed unless MDC agreed to pay Metric's claims for out-of-scope work and/or convert the subcontract to a cost-plus-fixed-fee basis. Metric's action in January 1990 constituted an anticipatory repudiation and material breach of its obligations, justifying MDC's decision to terminate for default.

Metric's position is, first, that its actions in January 1990 did not constitute anticipatory repudiation, and second, that it had no contractual duty to proceed. Metric argues that it had no duty to proceed for several reasons: (1) prior material breaches by MDC relieved Metric of any duty to proceed; (2) performance had become impossible or impracticable; and (3) MDC had refused to provide Metric with clear direction. Because it was relieved of its duty to proceed, its decision to suspend performance, even if tantamount to anticipatory repudiation, was not wrongful.

■ Applying general principles of contract law to those material facts as to which there is no genuine issue, I conclude that Metric did repudiate the contract in January 1990, without justification, and in breach of its duty to proceed.

(1) *Metric's duty to proceed.* Under the disputes clause of the OBL Basic Agreement, Metric was obligated to make a written demand for a final decision from MDC "*regarding the disposition of any dispute between the parties relating to [the] contract.*" (Doc. 73 Ex. 1 at p. 36) (emphasis added). If Metric wished to challenge any such final decision from MDC, it could file suit within certain time limits. Most importantly, Metric agreed to proceed with performance while pursuing dispute resolution. The scope of Metric's duty to proceed is set forth in the OBL Basic Agreement as follows: "Pending

the final resolution of any dispute involving this contract, Subcontractor agrees to proceed with performance of this contract, including the delivery of goods, in accordance with MDC's instructions." *Id.*

This dispute resolution mechanism mirrors the disputes procedure contained in standard form federal procurement contracts. The standard federal disputes clause requires the contractor to submit all claims, in writing, to the government's contracting officer for final decision. (Doc. 69 Ex. D). The contractor may challenge the contracting officer's decision by appealing to the board of contract appeals or by filing suit in the United States Court of Federal Claims. The standard federal contract requires the contractor to continue performance pending final resolution of any claim.

The policy interests favoring such a procedure are obvious. Particularly when the contract is to supply equipment needed by the armed forces, the government has a paramount interest in requiring the contract to proceed to completion, notwithstanding disputes. As one court put it, "It is essential that the prime contractor on projects such as [this] be permitted to say to its subcontractors, in essence, 'Work now, ask questions later.'" *Vermont Marble Co. v. Baltimore Contractors, Inc.*, 520 F.Supp. 922, 928 (D.D.C.1981).

Plainly, Metric had disputes with MDC which led it to suspend performance in January 1990. Metric maintains that these disputes were not embraced by the duty to proceed, because those disputes concerned material breaches of the contract by MDC. According to Metric, disputes involving alleged material breaches by MDC are not "disputes involving [the OBL] contract," so Metric had no duty to proceed pending the resolution of those disputes. I find that Metric's suggested interpretation of the duty to proceed clause fails as a matter of law.

The goal of contract interpretation is to discern what the parties intended the contract to mean. Cal.Civ.Code §§ 1636,

1638 (West 1993); *United Commercial Ins. Serv. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir.) (applying Calif. law), *cert. denied*, —— U.S. ——, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992). "The relevant intent is 'objective'—that is, the intent manifested in the agreement and by surrounding conduct— rather than the subjective beliefs of the parties." *Id.* The first rule in interpreting the language of a contract is to give words their ordinary, common meaning. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir. 1992); *Woodbridge Place Apts. v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1436 (7th Cir.1992); *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal.App.3d 1, 9, 262 Cal.Rptr. 716, 720 (1989). Without evidence that the parties used words in a unique sense or understood them to possess a technical meaning, words are to be interpreted to have their ordinary, popular meaning. *Moss Development Co. v. Geary*, 41 Cal.App.3d 1, 9, 115 Cal.Rptr. 736, 741 (1974).

The words at issue here are "any dispute involving this contract." Metric's opposition to MDC's motion rests upon the argument that the disputes which led it stop performance were not disputes "involving the contract." "Involving," of course, is the present participle form of "involve." According to Webster's Third New International Dictionary, "involve" means to draw in as a participant, engage, employ; to have within or as a part of itself; contain, include; to require as a necessary accompaniment; entail, imply; to have an effect on; concern directly; affect.

Based on these definitions, which express the common understanding of the word "involve," I hold that the phrase "involving the contract" can only reasonably be understood to include the disputes which led Metric to stop performance.[7] The nature of Metric's disputes were over its entitlement to additional compensation for work it considered to be out of the scope of the contract, MDC's seemingly inconsistent and conflicting contract specifications, Metric's contractual duty to produce drawings as demanded by MDC, and the like. These are the matters cited by

***

7. There is no evidence that the parties understood the term "involving the contract" to have a special, technical meaning.

Metric in its correspondence to MDC; these were the disputes that led Metric to stop work on the contract.

The disputes which led Metric to stop work had reference to the contract, they directly concerned the contract, they required the contract as a necessary accompaniment. Plainly, they *involved* the contract. Metric's view of these disputes may have led it to conclude that MDC was in breach, but that does not change the fact that the disputes involved the contract, and Metric was obligated to continue performance pending their resolution. If disputes of this nature do not "involve the contract," then that phrase loses much, if not all, of its meaning. It bears repeating that contract terms must be given their plain meaning, lest commercial dealings loose all semblance of predictability. I hold as a matter of law that Metric had a duty to proceed with performance while it first sought to resolve its disputes with MDC through the dispute mechanism provided for in the OBL subcontract.

In so holding, I reject, as a matter of law, Metric's argument that disputes over material breach were not subject to the duty to proceed requirement. Metric cites a line of authorities which have held that a contractor's duty to proceed pending resolution of disputes does not extend to disputes involving alleged material breaches by the government. *See, e.g., United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1965); *Malone v. United States*, 849 F.2d 1441 (Fed.Cir.1988), *modified*, 857 F.2d 787 (1988).

This line of authority is based on the specific wording of one version of the standard disputes clause contained in federal procurement contracts.[8] In that version, the contractor's duty to proceed pending resolution of disputes is confined to disputes "arising

under the contract." Courts have held that disputes over alleged breaches by the government do not "arise under" the contract. *United States v. Utah Constr. & Mining Co., supra*, 384 U.S. at 413, 86 S.Ct. at 1555, 16 L.Ed.2d at 656. In response to this narrow interpretation of the standard "arising under" clause, an alternate version of the disputes clause was drafted. The alternate version extends the contractor's duty to proceed pending the resolution of any claim "arising under or relating to the contract."[9]

The OBL subcontract's disputes clause did not incorporate either version of the standard form federal clause. The disputes clause in the OBL subcontract did not limit Metric's duty to proceed to disputes "arising under the contract." Rather, the duty to proceed imposed by the OBL subcontract is broader: the duty to proceed extends to any dispute "involving the contract." As is stated above, I find that the term "involving the contract" includes the disputes which led Metric to suspend performance.

▮ Metric also argues, almost as an aside, that the disputes provision of the OBL subcontract is unconscionable, because it requires that disputes be submitted to MDC's purchasing representative. Metric cites *Graham v. Scissor–Tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165 (1981), as authority for this proposition. *Graham* arose out of a dispute between a promoter of musical concerts and a musician who hired the promoter to promote a series of concerts. When the promoter later sued for breach of contract, the musician moved to compel arbitration.

At issue in *Graham* was the enforceability of a clause in the contracts between the promoter and the musician which required that all disputes be submitted to arbitration before the musicians' union. The clause pro-

---

8. This version of the disputes clause provides:
   The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim appeal, or action *arising under the contract*, and comply with any decision of the Contracting Officer.
   Federal Acquisition Regulation 52–233–1, 48 C.F.R. § 52.233–1(i) (1992).

9. The alternate clause provides:

   The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.
   Federal Acquisition Regulation 52.233–1, Alternate I, 48 C.F.R. § 52.233–1 (1992).

vided further that the decision of the musicians' union as to any dispute "shall be conclusive, final and binding upon the parties." 28 Cal.3d at 812, 171 Cal.Rptr. 604, 623 P.2d 165. California's Supreme Court held that the mandatory arbitration clause, which chose an arbitrator who was "presumptively biased in favor of one party" [*Id.* at 821, 171 Cal.Rptr. 604, 623 P.2d 165], was unconscionable. 28 Cal.3d at 828, 171 Cal.Rptr. 604, 623 P.2d 165.

Two salient facts distinguish *Graham* from this case. First, in *Graham*, the determination of the (biased) arbitrator was "conclusive, final and binding upon the parties." This is not so in this case. The disputes clause in the OBL subcontract provides that Metric can challenge the decision of MDC's purchasing representative by filing a lawsuit. The decision of MDC's purchasing representative becomes "conclusive and binding" only if it is not challenged in court. Thus, unlike the arbitration process in *Graham*, the dispute resolution mechanism in this case does not purport to wholly displace judicial review of controversies between the parties to the contract.

Second, in *Graham*, the court found that the promoter had no choice but to do business on the terms which the court found offensive. 28 Cal.3d at 812, 171 Cal.Rptr. 604, 623 P.2d 165. This was because all musicians of any prominence were members of the musicians' union, and the union prohibited members from signing any contract other than the standard ones prepared by the union. Thus, the promoter "was required by the realities of his business as a concert promoter to sign [union] form contracts with any artist with whom he wished to do business." *Id.*

In this case, by contrast, Metric has offered no evidence to suggest that it was forced to do business on MDC's terms or not do business at all. The undisputed facts of record show the opposite was true. MDC, on two occasions, made a point of asking all prospective OBL subcontractors to indicate any exceptions they might have to the proposed terms of the subcontract. The Request for Proposal instructed prospective subcontractors that their responses must in-

dicate acceptance of or exception to all terms and conditions. "If exception is taken, specifically identify the item, your reasons for the exception, and where appropriate, furnish recommended alternative language." (Doc. 73 Ex. 2).

Later, when inviting a revised proposal in light of minor modifications, MDC advised Metric to "revisit the DAC Terms and Conditions to ensure that no problems/uncertainties exist which could cause a delay or misunderstanding in the event of contract award." (Doc. 73 Ex. 4). On neither occasion did Metric take issue with any of the terms or conditions. Metric's protestations of unconscionability ring hollow now, in light of its silence when it was invited to object to any contract terms.

Metric also challenges the changes clauses of the OBL subcontract as unconscionable. Metric argues that the changes clause was unconscionable because it allowed MDC to order changes during the design phase of the project without requiring compensation for those changes. From the depositions that have been filed, it appears that no one at Metric noticed that the changes clause was different from that found in the standard-form government procurement contract. This, despite the fact that MDC asked bidders on two occasions to review the terms and conditions to prevent the disputes that could cause a "delay or misunderstanding."

Metric's argument that the non-standard changes clause somehow justified its stopping work on the project is a red herring. Notwithstanding the changes clause, Crosthwait assured Metric that it would be compensated for out-of-scope changes, but that those changes had to be properly documented and asserted in accordance with contract procedures. Rather than asserting its claims in the manner called for in the contract, and giving MDC a reasonable chance to approve or deny them, Metric first halted performance. If MDC, relying on the changes clause, had issued a final denial of the claims for compensation, then Metric might be in a position to challenge the changes clause as unconscionable.

(2) *Had performance became impossible or impracticable?* Metric makes several arguments—other than alleged prior material breaches by MDC—as to why it was not obligated to proceed with performance in January 1990. Metric contends that performance had become impracticable or impossible, and that MDC had failed to give clear direction when so requested. I find, as a matter of fact and law, that these proffered reasons did not excuse Metric from the duty to proceed.

First, as to Metric's argument that MDC had failed to give clear direction, and that inconsistent design specifications made it impossible for Metric to proceed, there is a genuine factual issue as to whether conflicts existed among the specifications issued by MDC. Jeffrey Bain, Metric's lead engineer on the project, identifies two specific instances of conflicting specifications. It is not disputed, however, that Metric failed to demand a final resolution of any such conflicts, as required by the disputes clause of the contract, before it informed MDC that it would proceed no further.

Also, the fact that inconsistent specifications may have existed hardly establishes that it had become totally impossible for Metric to do any further work on the contract. Even if it had become impossible for Metric to do any further work—a point on which Metric has not made a *prima facie* showing—that was not, in fact, what led Metric to suspend performance. According to Metric's president, Coy Scribner, at the time he determined to suspend performance, neither Bain nor any other Metric employee had advised him that it was physically impossible to proceed with the technical requirements on the OBL program. (Scribner Dep. at 126). Scribner stated that, at the time Metric suspended performance, it was his understanding that there was work that Metric could do on the project.[10]

Metric's commercial impracticability argument is similarly unpersuasive. A good deal of risk was inherent in the subcontract itself, which called for Metric to design and develop an OBL to conform to performance specifications, and to do so on a firm-fixed price basis. Metric argues that performance had become impracticable because of MDC's constant revision of the OBL specifications. That process was inherent in the nature of the contract, which required extensive interplay between design proposals and drafts on the one hand and performance specifications on the other.

If, as Metric contends, the costs of complying with MDC's demands were spiralling far beyond the contract price, Metric should have given MDC the chance to rule on the cost impact statements before suspending performance and conditioning a resumption upon MDC's agreeing to pay substantially all of the claims or converting to a cost-plus contract. If MDC had refused to pay for the alleged changes, then Metric might have a legitimate claim that performance had become commercially impracticable. But Metric should have exhausted all reasonable alternatives before concluding that performance was commercially impracticable and halting performance. *See Jennie–O Foods, Inc. v. United States,* 580 F.2d 400 (Ct.Cl. 1978) (because commercial impracticability standard is easily abused, contractor must prove that it explored and exhausted all reasonable alternatives before concluding performance was senseless or impracticable).

Metric did not give MDC a reasonable opportunity to address the merits of Metric's claims for additional compensation before it halted work. Instead, fresh on the heels of the last cost impact statements was notice that Metric had stopped performance. Surely one of the most reasonable alternatives, that being to demand a final decision on the disputed issues in accordance with the subcontract's dispute mechanism, was ignored by Metric. It is also worth noting that, according to Charles Johnson, Metric's executive vice-president, Metric's financial condi-

---

**10.** Scribner's testimony that MDC's "attitude about everything was impossible to work with" [Scribner Dep. at 60], cited by Metric, hardly suffices to create a genuine issue as to impossibility of performance. The "impossibility of performance" (a term of art) that discharges a contractual duty to perform requires far more than a belief, or even proof, that the other party is "impossible" to work with.

tion was not a factor in the decision to stop work; continuing with the OBL project did not threaten to bankrupt Metric. (Johnson Dep. at 46).

▮ (3) *Metric's repudiation of the contract in January 1990.* Having concluded that Metric had a contractual duty to continue work on the OBL project pending resolution of its disputes with MDC, I now turn to Metric's actions in January 1990, when it halted performance. Based on the undisputed facts of what transpired at that time, I find as a matter of law that Metric repudiated and breached the OBL contract.

It is undisputed that, three days after sending MDC the last of the cost impact statements demanding additional compensation, Metric stopped all work on the OBL project. On that day, January 5, 1990, Metric informed MDC that it was "unable to finalize the design of the KC–10 OBL." (Doc. 69 Ex. G). Metric stated that it was suspending all efforts on the project, but it would be willing to continue on a cost-plus basis. *Id.*

Negotiations between the parties in January 1990 did not get beyond that impasse. Metric's position remained that it would resume design work on the OBL project only if MDC either converted the subcontract to a cost-plus basis or agreed to pay all, or substantially all, of Metric's claims for additional compensation (the twelve of which are in the record exceed $500,000.00, and the contract price for design and delivery of the first unit, after the R2 modification, was $1,961,797.92). Metric's position is clear from its letters to MDC in January 1990. Coy Scribner, Metric's president, testified in deposition that the options that would have led Metric to resume design work were conversion to cost-plus contract or payment of the outstanding claims. (Scribner Dep. at 103).

Apparently, no one at Metric even considered pursuing the disputes-resolution process required by the subcontract. Metric presented MDC with a flurry of cost impact statements, and, without giving MDC a reasonable amount of time to evaluate their merits, halted work. Metric never made a final demand for MDC to resolve these claims, or any other contract disputes, as

Metric had both a right and duty, under the subcontract, to do.

Scribner, Metric's president, testified that he does not know if Metric complied with the disputes procedure, but that he would be very disappointed with his contract administrators if they had not considered this "option." (Scribner Dep. at 68). According to Scribner, at the time performance was suspended, he had no knowledge of the proper procedures under the subcontract for asserting claims; he had never been briefed on this. *Id.* at 113. Charles B. Johnson, Metric's executive vice-president testified to similar effect: he doesn't know why Metric did not invoke the disputes procedure before stopping work. (Johnson Dep. at 46).

Thus, there is no genuine factual issue as to what Metric did in January 1990: it stopped work and told MDC it would only resume work if the contract were converted to a cost-plus basis or if Metric's claims for substantial additional compensation were paid. The other "options" Metric offered, termination of the contract for convenience, and a partial termination for convenience of the design phase, were options which would have *discharged* Metric from its contractual duty to complete the OBL design. They were not options by which Metric would satisfy its duty to complete the design.

Metric's act of halting performance in contravention of its duty to proceed constituted both an anticipatory repudiation and a material breach of the OBL subcontract. MDC reminded Metric that it must assert its claims in accordance with the contract, that MDC had not yet ruled on the claims, and that Metric could challenge any decision through the disputes process of the subcontract. Finally, MDC reminded Metric that it was obligated to proceed with performance while the disputes were addressed. Metric responded not by resuming performance, but by ambivalently stating that it was "willing to give it our best efforts under proper circumstances." (Doc. 69 Ex. K). Scribner explained that "proper circumstances" were the options discussed above.

Faced with a repudiation and material breach, MDC properly terminated the sub-

contract for default. There is ample legal authority for a contractor to respond to an anticipatory repudiation or material breach by terminating the contract for default. That Metric repudiated and breached the contract, and that MDC properly terminated it for default, are illustrated by several cases.

In *Cascade Pacific Int'l v. United States*, 773 F.2d 287 (Fed.Cir.1985), the government was found to have acted properly in terminating for default a contractor who breached the contract by anticipatory repudiation. The contractor had sent the government a letter stating that it would be unable to perform the contract unless the government agreed to modify the specifications. This statement was held to constitute an anticipatory repudiation:

> When there is a 'positive, definite, unconditional, and unequivocal manifestation of intent ... on the part of a contractor of his intent not to render the promised performance when the time fixed therefor by the contract shall arrive, the contracting officer ... may terminate the contract forthwith on the ground of anticipatory breach.'

*Id.* at 293.

In *Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854 (2d Cir.1987), a contractor was held to have materially breached a military supply contract by halting performance at the same time it submitted claims to arbitration. In that case, Recon contracted to build an aerial reconnaissance system for the Israeli Air Force ("IAF"). Disputes soon arose over contract specifications, until it became clear that the project would not be completed on time. Recon blamed this on the IAF's insistence on unreasonable specifications; the IAF claimed that Recon's own mistaken estimations were at fault. *Id.* at 855.

Recon proposed several modifications of the contract and made several million dollars worth of changes, for which the IAF refused to pay. *Id.* Recon submitted its claims for additional compensation to arbitration, as required by the disputes clause of the contract. Simultaneously Recon halted work. The IAF declared Recon in material breach of contract and responded by drawing down a contractual letter of credit. *Id.* Recon sued to enjoin the draw-down.

At issue was whether Recon breached the contract by halting performance when it submitted its claims to arbitration. The contract contained a clause which provided, "pending the final disposition of any dispute hereunder, [Recon] agrees to proceed diligently with the performance of this Contract." *Id.* at 856. The court held that Recon was obligated to continue performance while the disputed claims were being arbitrated, and that Recon committed material breach by stopping work. *Id.* at 857. The court also rejected Recon's argument that it was not obligated to continue work due to impossibility of performance. Recon's chief financial adviser admitted that Recon terminated the contract not because of impossibility of performance, but because of its dispute with the IAF over payment for the modifications. *Id.*

In *Keyway Contractors, Inc. v. Leek Corp.*, 189 Ga.App. 467, 376 S.E.2d 212 (1988), a subcontractor on a government construction contract was held to have breached the subcontract by halting work in contravention of a contractual duty to proceed. When a dispute arose between the subcontractor, Keyway, and the prime contractor, Leek, over payment, Keyway halted work and left the job site. Leek then sued, claiming that Keyway's work stoppage was a material breach. Keyway counter-claimed, alleging that Leek committed a prior material breach by not paying money Leek allegedly owed Keyway. *Id.* at 213.

The subcontract contained a disputes clause governing "any controversy [that] should arise between [the parties] with respect to *any matter or thing involved in* this Subcontract." *Id.* (emphasis added). The disputes clause provided that "[n]o dispute or controversy shall interfere with the progress of construction, and Keyway shall proceed with its work without interruption, deficiency, or delay." *Id.* at 214. Keyway sought to excuse its work stoppage by arguing that Leek had committed a prior material breach by withholding money allegedly due Keyway.

The court rejected Keyway's attempt to circumvent its duty to proceed. Instead, the court held that Keyway's work stoppage con-

stituted a material breach, notwithstanding its argument of a prior breach by Leek:

[T]he parties agreed in their contract to resolve disputes by means of arbitration. The parties also agreed to proceed with their work despite any disputes. Under the terms of the contract, Keyway should have placed the dispute in arbitration and continued working pending the resolution of the dispute. Keyway, instead, voiced its displeasure with Leek's method of payment by walking off the job, in direct and material violation of the contract. Keyway's claim that Leek breached the contract and that Leek's breach preceded that of Keyway cannot stand in the face of the method of dispute resolution contained in the contract.... There was ... no question but that Keyway had materially breached the contract by abandoning the unfinished project.

*Id.* at 214.

Similar to *Keyway* is *Vermont Marble Co. v. Baltimore Contractor, Inc.,* 520 F.Supp. 922 (D.D.C.1981). In that case, a dispute arose between the prime contractor and a subcontractor on a contract to construct the Senate Office Building. The subcontractor rescinded the subcontract when it concluded that the prime contractor had caused delays in the project. Relying on a "time of the essence" clause, the subcontractor argued that the contractor's acts amounted to material breach, and material breach gives the non-breaching party the right to rescind. *Id.* at 927.

The court rejected the subcontractor's proffered justification for the rescission as "too facile." "It ignores the cardinal principle of contract interpretation which requires that a contract be read and interpreted as a whole, finding meaning in all parts if possible, while finding meaning in the whole." *Id.* The subcontractor's argument ignored the disputes clause of the contract, which required that claims arising out of disputes over delays be submitted in writing to the prime contractor. *Id.* at 927–28.

There is ample authority to similar effect in decisions of the various boards of contract appeals. In *Twigg Corp.,* 93–1 BCA ¶ 25,318, 1992 WL184984 (NASABCA 1992), a contrac-

tor refused to follow the government's directions to continue performing during the time that a dispute was submitted to the government's contracting officer. This act by the contractor was found to constitute anticipatory repudiation of the contract, which justified a termination for default.

In *Crown Welding, Inc.,* 89–1 BCA ¶ 21,-332 at 107,571–72, 1988 WL 123533 (ASBCA 1988), a contractor began work on a firm-fixed price contract, then determined that additional work items were needed to complete the contract. The contractor submitted an "unsolicited proposal" to the government, proposing a substantial increase in man-hours. The government refused to agree to compensate for the extra man-hours, and ordered the contractor to resume work. The contractor refused, and informed the government that "work cannot be accomplished as awarded."

The contractor later told the government that it would "complete performance on the job when an appropriate contract is agreed upon which will cover the costs and expense of the entire job." The government then terminated the contract for default. The contractor argued that it was justified in not completing performance because full performance was both "practicably and commercially impossible under the circumstances." Further, the board of contract appeals held that the contractor had repudiated the contract, which justified the termination for default. The contractor failed to meet the heavy burden of proving that performance was commercially impracticable. *Id.* at pp. 107,571–72, 1988 WL 123533.

In *Dave's Excavation,* 90–1 BCA ¶ 22,311, 1989 WL 112981 (ASBCA 1989), a contractor who refused to continue work pending the resolution of a price dispute was properly terminated for default. In that case, a builder contracted to construct a lean-to on government property on a firm-fixed price basis. When a dispute arose as to specifications, the builder refused to finish the project until the government acceded to its claim for $99,367 in additional compensation and a one-year extension of the deadline.

The builder announced in a letter to the government that "[t]his job has been shut down since 25 March 1986 as a result of government action and is shut down to date. This also confirms [that] the job is still shut down and will continue in this status until either we reach a negotiated settlement or we receive direction on how to proceed." *Id.* at p. 112,033, 1989 WL 112981. The board held that the builder's refusal to finish the project until it was paid on its claim violated the disputes clause of the contract, which required it to proceed diligently with performance pending resolution of a claim. As a result, the government's termination for default was proper. *Id.* at p. 112,035, 1989 WL 112981.

In *D.H. Dave and Gerben Contracting Co.,* 1962 BCA ¶ 3493, 17,838–39, 1962 WL 939 (ASBCA 1962) a contractor was properly terminated for default for flouting the duty to proceed. In that case, Gerben entered into a fixed price contract with the government to construct school buildings, roads, and appurtenant structures. Gerben encountered numerous problems requiring specification changes. The government's contracting officer ordered the changes, but Gerben refused to resume work until the contract was amended to include the additional compensation to which it was entitled. The contracting officer directed the contractor to resume work, the contractor refused, and the government terminated the contract for default. *Id.* at p. 17,835, 1962 WL 939.

The board found that the contract was properly terminated for default:

> If [Gerben] had taken any reasonable steps whatsoever to resume work we believe our finding would of necessity be to the contrary, as [Gerben] was entitled to a considerable time extension for the suspensions ordered, changed conditions encountered, and changes ordered. Instead [Gerben] took no steps whatsoever toward resuming work and instead laid down several conditions that had to be met ( [Gerben's] word is 'resolved') before it would resume work.... A reasonable man would have understood that [Gerben] was refusing, and would continue to refuse, to resume work until agreements were reached on

the conditions laid down by [Gerben]. Considering all of the demands made by [Gerben] such refusal—if not tantamount to an anticipatory breach—certainly could only lead to the conclusion that the work would not be completed within the time specified or any extension thereof.

*Id.* at 17,839, 1962 WL 939. Under the terms of the contract, Gerben was not privileged to stop work pending a decision on disputes that had arisen under the contract. *Id.*

### III. *CONCLUSION*

By Metric's own account, it was an aerospace company with more than thirty years experience in military contracts and ample financial resources. Metric agreed by contract to continue work on the OBL contract while seeking resolution of disputes involving that contract in a particular manner. When contractual disputes reached what Metric apparently considered to be a critical stage, Metric halted work and informed MDC that it would not resume work unless MDC either converted the contract from fixed price to cost-plus, paid all or substantially all of more than $500,000.00 in outstanding claims, or found someone else to complete design.

In choosing that course, Metric shunned its obligation to demand from MDC a final decision on the disputed issues, and, more importantly, shunned its duty to continue working on the contract pending resolution of the disputes. This amounted to both a repudiation and a material breach of the OBL subcontract. MDC acted within its rights when it terminated the OBL subcontract for default.

For these reasons, McDonnell Douglas is entitled to summary judgment on Count I of the complaint and Count I of the counterclaim. Its motion for partial summary judgment is GRANTED as to liability, with the issue of damages on Count I of the counterclaim remaining open.

DONE AND ORDERED.